376 P.2d 956

**AMERICAN HOSPITAL AND LIFE INSURANCE CO., a corporation, Plaintiff-Appellant,**

Guarantee Reserve Life Insurance Company, Third-Party Defendant-Appellant,

v.

Oscar KUNKEL and Mary A. Kunkel, Defendants and Third-Party Plaintiffs-Appellees.

No. 6929.

Supreme Court of New Mexico.

Dec. 10, 1962.

Carpenter, Phelps & Norwood, Roswell, Boyle, Wheeler, Gresham, Davis & Gregory, San Antonio, Tex., for appellants.

Sanders & Bruin, Roswell, for appellees.

FEDERICI, District Judge.

Three sets of parties appear on the caption in the trial court as well as in this court. So far as pertinent here, party-wise, they are American Hospital and Life Insurance Company, a corporation, who were plaintiffs below and appellants here, and Oscar Kunkel and Mary A. Kunkel, who were defendants below and appellees here. In this opinion we shall refer to plaintiff-appellants as American and to Oscar Kunkel and Mary A. Kunkel as Oscar and Mary. Guarantee Reserve Life Insurance Company, when necessary to be mentioned herein, will be referred to as Guarantee.

■ The evidence in the lower court was voluminous as evidenced by two large volumes comprising the transcript of record together with an additional volume containing exhibits. The trial court, however, made findings of fact and conclusions of law and, of course, the pertinent findings of fact made by the trial court are the facts in this court unless successfully attacked in this court and set aside for lack of sufficient supporting evidence.

It might be stated in the inception that since this case was decided in the trial court and since the perfection of the appeal in this court, the Supreme Court of the State of Colorado on November 13, 1961, rehearing denied December 4, 1961, handed down an opinion holding, in effect, contrary to appellant's contention in this court, and holding favorably to the ruling of the trial court below. The only real basic difference in the situation here and in the Colorado Supreme Court was that in the Colorado case it was John and Caroline suing American, whereas here it is American suing Oscar and Mary. American in the Colorado case is the same American involved in this case and John and Caroline in the Colorado case being in substantially the same situation as Oscar and Mary in this case. The Guarantee involved in the Colorado case is the same Guarantee involved in this case, and the Sherritt mentioned in the Colorado case is the same Sherritt mentioned in this case. The McCreless involved in the Colorado case is the same McCreless referred to in this case. Basically, the transactions between the parties and individuals involved were and are substantially the same in both cases. See Guarantee Reserve Life Insurance Company v. Holzwarth, 1961, Colo., 366 P.2d 377.

The issues in this case arose by American suing Oscar and Mary on a note or notes secured by real estate mortgage given to Guarantee for the purchase of Guarantee stock under certain conditions of repurchase by Guarantee, as hereinafter more fully set out. In due time said notes and mort-

gage were assigned to American by Guarantee through its President Sherritt.

The facts in this case, as found by the court and supplemented from the transcript of record for purposes of clarification and identification of parties, follow.

Prior to the execution of the pertinent note or notes in question by Oscar and Mary on or about December 31, 1953, Guarantee was under the management and control of its President, John S. Sherritt, who controlled the voting rights of a majority of the stockholders of the corporation, Guarantee being an insurance corporation and existing under the laws of the State of Colorado and authorized to transact insurance business in the State of New Mexico. American is an insurance corporation organized and existing under the laws of the State of Texas and authorized to transact insurance in the State of New Mexico. During the time pertinent here, S. E. McCreless was and is president of American and in control of the affairs of American.

At the time of the purchase by Oscar and Mary of Guarantee stock through Sherritt in December, 1953, Sherritt, on behalf of Guarantee, agreed orally, later reduced to writing in March of 1954, that if at any time Oscar and Mary should consider it advisable to return to Guarantee all or any part of the 11,428 shares of Guarantee stock, Guarantee would reduce the mortgage proportionately, or completely release the mortgage if all the stock were returned.

On December 29, 1954, Oscar and Mary gave notice to Guarantee that they desired Guarantee to repurchase their stock under the repurchase agreement, and returned the stock to Guarantee. They requested that their mortgage be released but the release has never been furnished them, nor were the notes returned. A few days later the returned stock of Oscar and Mary was transferred by Sherritt to other individuals, most of it going to Sherritt, president of Guarantee.

Subsequent to the return of the stock by Oscar and Mary to Guarantee and in August, 1955, Sherritt, on behalf of Guarantee, and McCreless, on behalf of American, negotiated a plan whereby McCreless would take an option to purchase a controlling interest in the stock of Guarantee, and by which he might take immediate control of the management and operation of Guarantee, which was consummated.

Also, in August, 1955, the Insurance Commissioner of Colorado required that American enter into a reinsurance agreement or treaty before he would approve the proposed option arrangements between Sherritt and McCreless. American loaned $175,000.00 to Sherritt, president of Guarantee, and Sherritt turned his stock over to American as collateral security, and transferred all voting rights under the stock to American. Under the management provisions of the option agreement, McCreless, president of

American, and other officers and employees of American became the officers of Guarantee and took over the majority of the positions as directors for Guarantee. American apparently would not have had to enter into the reinsurance agreement if it had not wanted to make the loan and option agreement with Sherritt. American assumed control of Guarantee in hopes that by various manipulations it would be taken into its holdings as a profitable transaction, and its officers acted in a speculative venture with knowledge that was peculiarly available to them, and they were experienced in insurance company business.

As a part of these negotiations, Guarantee, through Sherritt, assigned over to American, through McCreless, the notes and mortgage that had been signed by Oscar and Mary for the purchase of Guarantee stock, but which Guarantee stock had, prior to the assignment, been returned to Sherritt on Sherritt's repurchase agreement with the request that the mortgage be released, but which mortgage was never released by Sherritt, nor were the notes returned. So at the time of these negotiations we find Sherritt now holding Oscar and Mary's shares of Guarantee stock, and also holding their notes and mortgage. When these negotiations were completed between Sherritt and McCreless (Sherritt for Guarantee and McCreless for American), Oscar and Mary had no Guarantee stock. Sherritt then assigned their notes and mortgage to

American, as well as their stock, as part of the Sherritt-McCreless negotiations.

The reinsurance agreement entered into between American and Guarantee provided that American would assume all policies of Guarantee; and the trial court found that by virtue of the reinsurance agreement American expressly assumed all liabilities of Guarantee, which would include, so the trial court held, the claim of Oscar and Mary against Guarantee. The trial court further found that prior to entering into the reinsurance treaty American investigated the books and records of Guarantee and the official reports made to lawful governmental authorities. The court further found that no records of any liability or contingent liability to Oscar and Mary were found in the corporation records of Guarantee, except for claims made therein after the date of the reinsurance treaty and after Guarantee apparently became insolvent. However, the trial court also found that Guarantee's stock book noted the return of the surrendered stock, and that Oscar and Mary in no way prevented the terms of the repurchase agreement, in the form of a letter, from being a part of the records of Guarantee.

The trial court further found no evidence of fraud or had dealing on behalf of Oscar and Mary although Oscar was a stockholder and member of the Board of Directors of Guarantee during the time of purchase of the stock and repurchase agreement and

reinsurance agreement. The trial court, in its finding that the stock surrendered by Oscar and Mary under the repurchase option was properly noted in the stock books of Guarantee and that said books disclosed that such surrendered stock had, within a few days, been transferred to Guarantee, also found that no consideration for such transfer appeared in said book. The trial court makes perhaps its most pertinent finding and conclusion in determining that the stock repurchase agreement was valid against Guarantee at the time of its birth, and particularly in finding that then and at the time of the exercise of the option by Oscar and Mary to surrender said stock to Guarantee, *the Guarantee company was solvent.* The trial court found further that such repurchase and release of the mortgage by Guarantee to Oscar and Mary would not at that time have reduced the security of the stockholders or policy holders to the extent that it would have rendered Guarantee insolvent, holding, as a consequence, that this would not impair the rights of creditors of Guarantee as against the rights of stockholders. This finding or conclusion of solvency reached by the trial court from the evidence before it as to the admitted assets and from the reports of Guarantee appears to be determinative of this case, in that the argument herein centers on whether the repurchase agreement with a stockholder was entered into at a time when Guarantee was insolvent and whether this would, in effect, affect the rights of Guarantee policy holders and other creditors, etc., under authorities cited pro and con in this case. The trial court made many other findings too numerous to mention, but we believe that we have set out the ones that are pertinent. Along with the finding of solvency at the time of the Guarantee-Oscar and Mary negotiations, the trial court found and concluded that under the reinsurance agreement American was an assignee of Guarantee and absorbed Guarantee, resulting in a merger de facto by American of Guarantee.

The gist of the trial court's holding is that the negotiation between American and Guarantee was not a mere sale but constituted a merger de facto, or a merger as a matter of law, regardless of non-compliance with certain statutory technicalities. The trial court held, in effect, that as between American and Oscar and Mary, both of which parties were apparently fleeced by Sherritt, the loss must fall on American. American, in their wheelings and dealings and manipulations with Sherritt assumed control of Guarantee in hopes that by various maneuverings American could take and absorb Guarantee into its holdings. American's hope was that this would be a profitable transaction. Perhaps it did not turn out to be profitable but American and its officers were acting in this speculative venture with knowledge that was peculiarly available to them in a business, namely, an

insurance business, in which they were experienced.

We cannot say that there is not sufficient evidence to support the findings of the trial court; nor can we say that from the facts found by the trial court, the court erred in the conclusion that here we have a merger de facto and that, consequently, American cannot recover from Oscar and Mary on a note secured by mortgage to Guarantee under a repurchase contract where they returned the purchased stock to Guarantee under a valid repurchase agreement, in view of the then solvency of Guarantee as found by the trial court.

This court has very recently restated the applicable rule on review. In Lucero v. Davis Contracting Company, 1962, N.M., 375 P.2d 327, we said:

"In reviewing evidence on appeal, all disputed facts must be resolved in favor of the appellee and all reasonable inferences drawn from the evidence should be indulged in to support the judgment. The evidence must be viewed most favorable to the judgment."

The facts found by the trial court are the facts before this court, unless set aside because not supported by substantial evidence. This court must view the evidence together with all reasonable inferences to be deduced therefrom in the light most favorable to the successful party, and all evidence to the contrary and reasonable inferences to be deduced therefrom must be disregarded. See Grisham v. Nelms, 1962, N.M., 376 P.2d 1, and cases cited therein.

The law and the evidence called to our attention by American might support American's position, but the trial court found otherwise, and the findings so made are, in our opinion, supported by substantial evidence. The trial court having resolved the possible conflict in the evidence, as well as reasonable contrary inferences to be drawn therefrom, and its findings being based upon substantial evidence, the same are conclusive on appeal. See Koran v. Bingham, 1962, N.M., 376 P.2d 28, and cases cited therein.

American argues that the evidence should be considered as proof in support of their theory that the reinsurance treaty between American and Guarantee created a debtor-creditor relationship and was not an absorption resulting in a merger de facto; that the proof supports American's contention that the repurchase agreement was unenforceable as against Guarantee and its creditors because of the impairment of capital and resulting insolvency of Guarantee, and was not available as an offset to any claim raised by Guarantee.

American further cites respectable authorities in support of their propositions and we have no quarrel with the authorities cited. Unfortunately for American, the trial

court, after considering all of the evidence and circumstances and reasonable inferences to be drawn therefrom, attendant to the repurchase agreement, the reinsurance treaty, and the negotiations between Sherritt and McCreless on behalf of Guarantee and American, found that the reinsurance treaty between American and Guarantee did not create a debtor-creditor relationship but, rather, found that it was an absorption by American of Guarantee resulting in a merger de facto. The trial court further found, from all the facts and circumstances in the case and reasonable inferences to be drawn therefrom, that the repurchase agreement was enforceable against Guarantee and now against American, in its mixed finding of fact and of law based on facts, that the stock repurchase agreement was valid against Guarantee as of the time of its birth, and was valid at the time of the exercise of the option by Oscar and Mary to surrender said stock to Guarantee. The trial court further found that Guarantee was solvent at these times, and that the repurchase of the stock and release of the mortgage would not at that time have reduced the security of the stockholders and policy holders and other creditors, to the extent that it would have rendered Guarantee insolvent.

The foregoing findings and conclusions of the trial court made on substantial evidence, as we see it, dispose of this case and foreclose American in this court. See Espinosa v. Petritis, 70 N.M. 327, 373 P.2d 820, and cases cited therein.

American cites the case of Morrill v. Harris, 23 N.M. 146, 167 P. 276 (1917). All this court held in that case was that in an action by the receiver of a banking corporation against the subscriber of stock in the corporation, the subscriber was entitled to show that the banking corporation, prior to the soliciting of the subscription, had subscribed all of its capital stock and, consequently, that the note given by the subscriber in payment of the subscription was without consideration.

This court then went on to hold that a corporation, through its officers, has no power to agree with a subscriber that his subscription shall be cancelled, unless such power is given to the corporation by charter, statute or by-laws of the corporation. This court used language to the effect that if the corporation had the power to accept subscriptions to its capital stock at the time of acceptance of subscriptions in question and for which a note was executed, it would not be competent for the subscriber, as against the representatives of *creditors* of the bank, to show a secret agreement between the subscriber and the bank to the effect that he had the right to demand a return of his note and cancellation of his subscription, at his option.

The first distinction between Morrill v. Harris, supra, and the case at bar is that

in that case we were dealing with a subscription for capital stock, whereas here we have an actual purchase followed by an option to repurchase. The second distinction is that in this case it appears that the Colorado statute clearly allows a corporation to purchase its own shares of stock and since the agreement was made by a Colorado corporation, was made in Colorado, and was to be performed in Colorado, the Colorado law is applicable. Furthermore, in Morrill v. Harris, supra, the company was in receivership and it was apparent that creditors were involved, whereas in the instant case there is no showing or finding that creditors are involved. It is merely an action by one corporation against an individual or individuals, namely American v. Oscar and Mary. Nor does it appear that the security of other stockholders, policy holders or creditors of Guarantee would have been impaired if Guarantee had lived up to its agreement to repurchase. On the contrary, the trial court found that at the time of the exercise of the option to return the stock by Oscar and Mary, such exercise of the option would not have rendered Guarantee insolvent.

■ Again, in the case at bar, we are not dealing with an offer of subscription of stock, but rather with the repurchase of stock by the corporation and, as already stated, apparently this is permissible under Colorado law; but even in the absence of statute, the weight of authority in this country is that corporations have the power and authority to purchase their own shares of stock. In Volume 6A of Fletcher, Cyc. Corporations (Perm.Ed.), under § 2845, at 359, we find the following language:

"Whereas formerly, the authorities showed a sharp conflict over the question whether, in the absence of any statutory or charter restrictions, a corporation could employ its assets for the purchase of shares of its own stock, during the period since the first World War and particularly since 1930 there has been a major shift so that at the present time only a few jurisdictions still retain the so-called minority rule forbidding the purchase of its own stock by a corporation."

and, also, in 13 Am.Jur. 808, Corporations, § 786, the following language is used:

"According to the prevailing rule in this country, a corporation may, in the absence of statutory or charter restrictions, purchase its own stock * * *."

The primary reason that courts in many instances have not enforced these repurchase agreements when the corporation is insolvent, or on the brink of insolvency, is to prevent a stockholder from becoming

a creditor in an attempt to claim a preference over, or at least be on a same preferential basis with, bona fide creditors. We agree with this reasoning. It is unfair for a stockholder to "ride out the storm" in a corporation and then as a corporation is about to "sink," attempt to place himself in the status of a preferred creditor to the detriment of other creditors. The reasoning behind this rule cannot apply here for the simple reason that the trial court found from the evidence that Oscar and Mary exercised their option to return the stock at a time when the corporation was solvent and no creditors would have then been adversely affected.

In this connection, there are many authorities which have upheld the validity of such repurchase agreements even in borderline cases involving such defenses as ultra vires, violation of public policy or statute relating to the purchase of their own stock by corporations, etc., see 101 A.L.R. 154.

As to when the courts look, time-wise, to the solvency or insolvency of the corporation on these repurchase agreements, the following statement is apropos, appearing at 101 A.L.R. 156:

"Provided that such recovery would not prejudice the rights of creditors or other stockholders of the corporation; as where *at the time agreed upon for the repurchase,* the corporation was solvent and would not thereby be rendered insolvent to the prejudice of corporate creditors." (Emphasis ours.)

The same A.L.R. annotation, at 159, continues, as follows:

"There is perhaps no dissent from the proposition that such agreements are under statutes or common law invalid and unenforceable if the effect of their enforcement is to work prejudice to the rights of the creditors or other stockholders of the corporation, as where the corporation is insolvent *at the time the option for the repurchase is exercised,* or will thereby be rendered insolvent, or where other stockholders in subscribing to the stock of the corporation relied upon the subscription affected by the repurchase or refund agreement." (Emphasis ours.)

Both parties in this court cite the case of Pankey v. Hot Springs National Bank, 1941, 46 N.M. 10, 119 P.2d 636. In that case we adopted favorably the following language:

"The Tenth Circuit Court of Appeals (opinion by Judge Orie L. Phillips) has stated the rule, as we understand it to be, as follows:

" 'The general rule is that where one corporation sells or otherwise trans-

fers all of its assets to another corporation, the latter is not liable for the debts and liabilities of the transferor. * * *'

" 'To this general rule there are four well recognized exceptions, under which the purchasing corporation becomes liable for the debts and liabilities of the selling corporation. (1) Where the purchaser expressly or impliedly agrees to assume such debts; (2) where the transaction amounts to a consolidation or merger of the corporation; (3) where the purchasing corporation is merely a continuation of the selling corporation; and (4) where the transaction is entered into fraudulently in order to escape liability for such debts. * * *' West Texas Refining & Development v. Commissioner of Int. Rev., 10 Cir., 68 F.2d 77, 81."

It will be seen from the findings of the trial court that this case comes within one or more of the exceptions above set out.

The authorities for all of the legal propositions involved in this proceeding are voluminous and are pro and con. We have cited only a few, mostly because of the use of the language therein which seems apropos. We should like to mention only two more decisions:

In Marks v. The Autocar Company, 153 F.Supp. 768, (E.D.Pa.1954), the court said:

"* * * However, I have no doubt that it is, in substance and in effect, a de facto merger, though not consummated in accordance with the procedure set up by the statute. Of course, there was a transfer of assets for a consideration, which could be properly designated a sale, but every merger has in it the elements of a transfer for consideration. Autocar's business was taken over by White which has, since the transfer, been conducting it as a division of its company. Autocar has been or is about to be dissolved and will cease to exist as a corporate entity abandoning its name and legal identity. When the transaction is completed, all of its stockholders will have passed into White and will have become members thereof. White has assumed all of the liabilities of Autocar and has acquired its goodwill and the right to use the name. * * *

*     *     *     *     *     *

"* * * The defendants have insisted throughout that the transaction involved in this case was not a statutory merger, and I have held that it was not. The intentional failure of the defendants to complete the statutory proceedings, while it may deprive the plaintiff of the statutory remedy consisting of the appointment of appraisers, does not deprive her of all rights

and does not deprive the Court of jurisdiction to accord such rights through ordinary court procedures.   *   *   * We see no reason, therefore, why equity should not also have authority to determine whether or not a merger has *in fact* taken place, where the statute is not followed by the corporation involved."

See, also, Troupiansky v. Henry Disston & Sons, Inc., 151 F.Supp. 609, (E.D.Pa. 1957), which cites the Marks case and holds that a merger de facto was effected under somewhat similar facts.

No doubt this was a difficult case, from a fact-finding standpoint, for the late learned trial judge who heard the evience, and it has been a difficult case here. However, under existing rules of review in this court, we do not here again reweigh the evidence; and our facts are the facts found by the trial judge in his decision, which findings of fact and mixed findings of fact and conclusions of law, we are not inclined to set aside under our well-known substantial evidence rule.

It follows that the judgment of the trial court should be affirmed.

IT IS SO ORDERED.

COMPTON, C. J., and CARMODY, J., concur.