501 F.2d 1145
 Alphonse CYR, Jr. and Arlene Cyr, Plaintiffs-Appellees,
v.
B. OFFEN & CO., INC., Defendant-Appellant and Third-Party
Plaintiff-Appellant, v. BLANCHARD PRESS, INC.,
Third-Party Defendant-Appellee.
Cyrenus COUTURE, Adm. Estate of Richard Couture, Plaintiff-Appellee,
v.
B. OFFEN & CO., INC., Defendant-Appellant and Third-Party
Plaintiff-Appellant, v. BLANCHARD PRESS, INC.,
Third-Party Defendant-Appellee.
Alphonse CYR, Jr. and Arlene Cyr, Plaintiffs-Appellees,
v.
R. HOE & CO., INC., Defendant-Appellant and Third-Party
Plaintiff-Appellee, v. RUMFORD PRINTING COMPANY,
Third-Party Defendant-Appellee.
 Nos. 74-1007-- 74-1009.
 United States Court of Appeals, First Circuit.
 Heard May 6, 1974.
Decided July 18, 1974.
 
 John Gilbert Upton, Concord, N.H., with whom Upton, Sanders & Smith, Concord, N.H., was on briefs, for Cyrenus Couture.
 William S. Orcutt, Manchester, N.H., with whom Wiggin, Nourie, Sundeen, Pingree & Bigg, Manchester, N.H., was on brief, for R. Hoe & Co., Inc.
 E. Donald Dufresne, Manchester, N. with whom McLane, Graf, Greene & Branch, Manchester, N.H., was on brief, for Rumford Printing Company.
 Stanley M. Brown, Manchester, N.H. with whom McClane, Graf, Greene & Brown, Manchester, N.H., was on brief, for Alphonse Cyr, Jr. and Arlene R. Cyr.
 James C. Wheat, Manchester, N.H., with whom Wadleigh, Starr, Peters, Dunn & Kohls, Manchester, N.H., was on brief, for Blanchard Press.
 Joseph F. Devan, Manchester, N.H., with whom Sheehan, Phinney, Bass & Green, Manchester, N.H., was on briefs, for B. Offen & Co. Inc.
 Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.
 COFFIN, Chief Judge.
 
 
 1
 A complex series of legal rulings are appealed in this diversity suit arising out of an industrial accident which resulted in serious injury to Alphonse Cyr and in the death of Richard Couture, employed as 'fly boys' at Rumford Press.
 
 
 2
 On October 20, 1969, the 4:00 p.m. to midnight shift at Rumford had the presses shut down for adjustment of the printing plates. Between 5:30 and 5:45 the head pressman, Sullivan, told Couture that the rollers would have to be cleaned of hardened accumulated ink. This was one of the tasks customarily undertaken by 'fly boys' who also would 'fly' the magazines off the press. They were the most junior members of the crew, working their way into the trade. At Rumford, roller cleaning was habitually accomplished by entering the ovens into which the rollers directed the printed paper for drying when the press was operating. Once within the drying ovens, the fly boys scraped and cleaned the rollers with rags and cleaning solvent.
 
 
 3
 On the day in question, there was some misunderstanding. When Sullivan suggested that the rollers needed cleaning, he did not have in mind any immediate need for action. He thought he was indicating that something be undertaken later, during the course of the shift. However, Couture understood that the job was to be done immediately. Couture and Cyr took their equipment and entered the two drying ovens situated one above the other at one end of the ninety foot long double deck printing press. Cyr entered the lower level oven, put the flammable solvent on the floor close to the gas burners, and set to work. Couture entered the upper level oven.
 
 
 4
 During this time the press was not turned off. It was either on jog speed, which permitted manual operation, or running slowly. This was consistent with cleaning practices as the rollers were only partially exposed within the ovens and had to be rotated to permit thorough removal of ink. But another practice frequently engaged in was not observed on this occasion. Often, a workman stood outside the ovens while the cleaning operation was conducted. This was done on a voluntary basis, but it gave assurance that anyone at the control panel of the press would be notified of the fly boys' presence inside the ovens.
 
 
 5
 Such notice to the person in charge of the press controls was needed because the operation of the press was inextricably tied to the working of the ovens. Once the press attained a certain speed, the dryers went on automatically. The only way to avoid this eventuality was to place the press controls on stop or safe or to push safe-run buttons located at various places around the press. Any of these procedures would shut down the presses. The evidence indicated that the fly boys never touched the press control panel. Nor were they given instruction in or in the habit of pushing the saferun button to accomplish this job.[1] In fact, the movement of the rollers necessary for satisfactory cleaning would be impossible if the safe-run button was on. In any case, the safe-run button was not depressed on this occasion.
 
 
 6
 Shortly after the fly boys' entry into the dryers, Sullivan needed to test the adjustments on the press, and started up the press. Within a very few minutes the press speed increased; the gas-fired burners within the dryers automatically ignited. Cyr heard the noise indicating the flow of gas and attempted to get out of the dryer, but the flammable solvent exploded, igniting his clothing. A similar explosion occurred at the same moment on the upper decks. Cyr was seriously injured and hospitalized, but survived. Couture's injuries resulted in his death several weeks after his hospitalization.[2]
 
 
 7
 The Couture Estate and the Cyrs instituted suit against B. Offen & Co., Inc. as manufacturer and seller of the drying system of Press No. 79 and R. Hoe & Co., Inc. as the assembler of the entire press and seller of the ovens, alleging negligence and strict liability on the theory that the dryers were defective due to the failure to contain a disconnect device on the drying oven doors, a 'fail-safe' device which could have prevented ignition of the burners while the doors were open.
 
 
 8
 The jury returned verdicts for each plaintiff on both counts, against both R. Hoe Co., Inc.[3] and B. Offen Co., Inc.[4] Damages on the negligence counts were reduced in direct proportion to the comparative negligence of the injured men. The jury rendered the following verdicts: in Alphonse Cyr v. R. Hoe & Co., Inc., $45,000 in negligence and $60,000 in strict liability; in Arlene Cyr v. R. Hoe & Co., Inc., $7,000; in Alphonse Cyr v. B. Offen & Co., Inc., $45,000 in negligence, $60,000 in strict liability; in Arlene Cyr v. B. Offen & Co., Inc., $7,000; in Cyrenus Couture, Administrator of the Estate of Richard Couture v. R. Hoe & Co., Inc., $45,000 in negligence and $50,000 in strict liability, which was limited pursuant to NHRSA, Ch. 556 13 to $20,000; in Estate of Richard Couture v. B. Offen & Co., Inc., $45,000 in negligence and $50,000 in strict liability, similarly limited to $20,000. The damages awarded in strict liability represented the total damages the jury believed the plaintiffs suffered; the negligence awards were reduced in proportion to the contributory negligence of the plaintiffs, and were not additional to those in strict liability but alternative awards. In practical effect this would mean recovery of the larger award.
 
 
 9
 * We address first the appellants' challenge to the district court's failure to direct the jury that contributory negligence and assumption of the risk could be considered as a basis for reducing the damages in strict liability. Similar directions were requested on both the negligence and strict liability counts. The district court directed the jury as requested on the negligence count[5] but removed the issue of contributory negligence or assumption of the risk from the jury on the strict liability count.
 
 
 10
 The majority of states have adopted a rule in strict liability cases, consistent with comment n to the Restatement of Torts 2d 402A. This rule limits defenses to situations where a plaintiff voluntarily and unreasonably proceeds to encounter a known danger.[6] There are strong policy reasons supporting this position.[7] Had this been the law applicable to this case, it might have been supportable to rule as a matter of law that Cyr and Couture did not voluntarily and unreasonably proceed to encounter a known danger.[8] But New Hampshire law controls, and that state has explicitly refused to adopt the Restatement rule. Nor is the New Hampshire, court-made law so dated or unclear that certification for a ruling on the question presents a viable alternative for us.[9] We are Erie bound to follow the clear expression of law in Stephan v. Sears, Roebuck and Co., 110 N.H. 248, 266 A.2d 855, 857 (1970):
 
 
 11
 'We affirm the doctrine that failure to discover or foresee danger which the ordinary person would have discovered or foreseen as well as negligent conduct after discovery of the danger and in the use of the product will constitute a defense to an action based on strict liability.'
 
 
 12
 See, also, Buttrick v. Lessard, 110 N.H. 36, 260 A.2d 111 (1969). Although there was considerably more evidence of actual knowledge in our recent case, decided after the trial of the instant case, Stevens v. Kanematsu-Gosho Co., Inc., 494 F.2d 367 (1st Cir. 1974), we reached the same conclusion on New Hampshire law. We therefore rule that the district court should have submitted to the jury the defenses of contributory negligence and assumption of the risk on the strict liability count.
 
 
 13
 This ruling affects Alphonse Cyr's recovery only, since contributory negligence could not be considered in determining Arlene Cyr's damages and the recovery of the Couture Estate was limited by New Hampshire's wrongful death statute. The New Hampshire legislature has indicated in its comparative negligence statute, that where a plaintiff's negligence is a relevant inquiry, and is found to exist, recovery should not be barred, but reduced in the ratio that the negligence of the plaintiff contributed to the injury. NHRSA Ch. 507:7-a. Applying this policy, Cyr's recovery in strict liability should be reduced in accordance with the reduction in negligence to $45,000.
 
 II
 
 14
 We turn now to a problem on which New Hampshire's law does not provide specific guidance. B. Offen & Co., Inc. challenges the district court's ruling of law that it could be held liable for the acts or omissions of its predecessor, B. Offen Company. B. Offen & Co., Inc., as such, was not a legal entity in 1959 when the press of which the ovens were a part was sold to Rumford. Press No. 79 was designed, manufactured and sold by B. Offen Company, then a sole proprietorship owned by Bernard Offen.
 
 
 15
 In 1962, Bernard Offen died after a long period of illness. Key employees continued to run the business, while the estate was controlled by the executor, through January of 1963. At that time the employee group, joined by a single outside financier who was not to participate in the business operation, contracted to purchase the company from the executor. Seventy per cent of the stock was divided among the employees and the outside financier obtained thirty per cent. The contract of sale called for payment of the purchase price over nine years, subject to anticipatory payment, and obligated the purchaser during that period to:
 
 
 16
 '(i) cause the Offen Business to be operated continuously . . . (ii) cause the Offen Business to be operated substantially in accordance with the same business practices and policies as are being employed by Offen at the date of the agreement.'
 
 
 17
 The purchase of good will and contract obligations was central to the agreement. Old service obligations were assumed by the purchaser and B. Offen & Co., Inc. continued to service and renovate old dryers including those at Rumford Press (although not under contract). No notice was given to known customers of B. Offen Company that a new or different business was beginning. B. Offen & Co., Inc. advertised itself as an ongoing enterprise, and even claimed in its advertising that it was a forty year old business. It continued to produce the same kind of product in essentially the same way that Bernard Offen had.
 
 
 18
 At trial, B. Offen & Co., Inc. (hereinafter Offen) moved for dismissal because it did not come into legal existence until after the date of the press sale. Offen stressed the explicit language of the contract of sale between the executor of Bernard Offen's estate and B. Offen & Co., Inc., i.e., that the purchaser assumes 'the liability for all costs of any kind or nature incurred on or after January 16, 1963 on Old Dryer and Service Contracts, . . . but excluding specifically liability for costs incurred in tort.'
 
 
 19
 The plaintiffs argued that while the contract provision may be binding between the parties, the contract cannot preclude recovery by a third party where liability to the third party is impliedly assumed because all other liability is explicitly assumed, all benefits are assumed, and the business is in essence a continuation of the prior business. Plaintiffs argue that the right created by the contract is one of the purchaser against the seller and has no effect on third parties. The district court, accepting plaintiffs' arguments, denied the motion to dismiss and Offen's subsequent motions for summary judgment and directed verdict, ruling that the jury could find B. Offen & Co., Inc. liable for whatever torts its predecessor may have committed.
 
 
 20
 This issue is one which has received little judicial attention. While plaintiffs cite a number of cases where the successor's corporate liability was premised on identity of ownership with its predecessor,[10] there is no question but that ownership here has changed hands. Nor was this a case where there were efforts to manipulate corporate structure so as to escape liability.[11] Here we face a good faith sale at arm's length, but also one where facial and substantive continuity were the essence of the bargain. On the one hand we face the problem of the buyer, who thinks it is purchasing a known set of assets and Habilities. On the other, we face users of a product who are not conscious of any change in responsibility on the part of the manufacturer.
 
 
 21
 We start from the premise that a transferee of assets is not under ordinary circumstances liable for the debts of its predecessor. But factual inquiry is mandated, as exceptions to this rule traditionally exist where: (1) there is an express or implied assumption of liability; (2) the transaction amounts to consolidation or merger; (3) the transaction was fraudulent; (4) some of the elements of a purchaser in good faith were absent; and (5) the transferee corporation was a mere continuation or reincarnation of the old corporation. West Texas Refining & Development Co. v. Commissioner of Internal Revenue, 68 F.2d 77, 81 (10th Cir. 1933); 15 Fletcher Cyclopedia Corporations 7122, 7123 (1973).
 
 
 22
 These exceptions were developed in the context of tax assessment and (1)-(4) have been applied to various types of cases without difficulty or reexamination. The parties have cited only a small number of cases which have dealt with the last mentioned exception of continuity, and those were in contexts other than that before us.[12] The few tort cases pointed to by the parties failed to face the problem of continuity and had no need to identify the means for determining continuity where negligence or strict liability was claimed.[13]
 
 
 23
 Our first question, then, is what factors to look to in order to determine whether there is sufficient continuity to warrant continued obligation. We gain some insight from the method of analysis used in the field of labor law when successor corporations have been held bound by the undertakings of their predecessors. In John Wiley & Sons v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964), the Court held that:
 
 
 24
 'the disappearance by merger of a corporate employer . . . does not automatically terminate all rights of the employees . . .. In the appropriate circumstances . . . the successor employer may be required to arbitrate with the union.' Id. at 548, 84 S.Ct. at 914.
 
 
 25
 Building on this theme in N.L.R.B. v. Burns International Security Services, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), a contractor, Burns, with no contractual relation to the prior contractor on the job, Wackenhut, was obligated to arbitrate with the Wackenhut employees' union because it took over a majority of the employees in order to perform essentially the same job. Although finding no continued responsibility, the recent decision in Howard Johnson Co., Inc. v. Hotel & Restaurant Employees, 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974), stressed that the facts of each case are central to the problem of employer obligations to employees in a successorship context.
 
 
 26
 We look also to the familiar law that a corporation cannot disable itself from responding to liability for its acts by distributing its assets. Pierce v. United States, 255 U.S. 398, 41 S.Ct. 365, 65 L.Ed. 697 (1921). New Hampshire has implemented this policy and endorsed it to the extent that even a legally dissolved corporation retains some existence for the purpose of being sued for three years after dissolution. NHRSA Ch. 294 98; see Henn & Alexander, Effect of Corporate Dissolution on Product Liability Claims, 81 Corn.L.Rev. 865 (1971). Such a policy is one of accommodation between the goals of fairness to creditors and freedom of business decision to terminate an enterprise. But the dictates of freedom of business decision are less compelling when an ongoing business assumes all other benefits and liabilities of its predecessor, holds itself out to the world as the same enterprise, without notifying known customers, continues to function in the same manner-- indeed is under contractual obligation so to do-- with the same key employees, producing the same product.
 
 
 27
 Thus, where tort liability is concerned, we should look to factors relevant to the specific claim and not be bound by the factors that control where other debts and liabilities are concerned. But first we face two threshold arguments[14] Offen first contends that it could not be held liable to plaintiffs for the simple reason that it was not in existence when the equipment was sold and installed and thus had no relationship with buyers or users of the equipment on which a duty of care could be predicated. This argument begs the question at issue: should B. Offen & Co., Inc. be treated as the continuation of B. Offen Company? The corporate veil has never been treated as an iron curtain barring examination of the facts peculiar to the individual case.[15]
 
 
 28
 A second defense is the protective language in the purchase agreement, specifically excluding the assumption of any tort liability. This provision, of course, bound the parties and would give B. Offen & Co., Inc. the right to recover over from its seller, but cannot determine the rights of third parties, when no effort to give notice of the change was made. See Abeken v. United States, 26 F.Supp. 170 (E.D.Mo.1939); see also Blumenthal v. Schneider, 186 Wis. 588, 203 N.W. 393 (1925).[16]
 
 
 29
 This brings us to the basic issue of the justification, on this record, of allowing the jury to treat B. Offen & Co., Inc. as a continuation of B. Offen Company for purposes of imposing liability.
 
 
 30
 We take as a starting point the considerations which undergird the doctrine of liability of a manufacturer in the first instance to see whether, or to what extent, they are pertinent to the liability of a successor. Appellant Offen has outlined four of the reasons for imposition of strict liability. They are that (1) the manufacturer is better able to protect itself and bear the costs while the consumer is helpless; (2) it is the manufacturer which has launched the product into the channels of trade; (3) it is the manufacturer which has violated the representation of safety implicit in putting the product into the stream of commerce; and (4) the manufacturer is the instrumentality to look to for improvement of the product's quality. To this we add the more traditional reason for imposing liability on a corporation for tortious injuries, the negligence of its employees. United Mine Workers v. Coronado Coal Co., 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975 (1922). The first and fourth reasons clearly apply to a successor in ownership, carrying on with the manufacture and servicing of the same line of equipment. While the first such successor to be faced with such a liability may claim surprise, the claim lacks legal force. For this kind of surprise is endemic in a system where legal principles are applied case by case and is no more an injustice than was the retroactive application of the strict liability doctrine in Stephan v. Sears, Roebuck & Co., 110 N.H. 248, 266 A.2d 855 (1970). The very existence of strict liability for manufacturers implies a basic judgment that the hazards of predicting and insuring for risk from defective products are better borne by the manufacturer than by the consumer. The manufacturer's successor, carrying over the experience and expertise of the manfuacturer, is likewise in a better position than the consumer to gauge the risks and the costs of meeting them. The successor knows the product, is as able to calculate the risk of defects as the predecessor, is in position to insure therefor and reflect such cost in sale negotiations, and is the only entity capable of improving the quality of the product.
 
 
 31
 As for the second and third policy reasons, enumerated above, it is true that the successor, by definition, was not the legal entity which launched the product on the stream of commerce or made an implied representation as to its safety. But in the most real sense it is profiting from an exploiting all of the accumulated good will which the products have earned, both in its outward representations of continuity and in its internal adherence to the same line of equipment.
 
 
 32
 We cannot believe that the issue of liability would turn on whether the founder's shares in the company decreased below a majority ownership, or whether he entered into an arrangement by which he sold all of his shares to his employees, with payment to be made over a period of years. The present case does not present quite such an en famille relationship, but the presence of a minority outside stockholder financier would not seem to call for a different conclusion. Finally, a corporation itself cannot act. It can conduct its business only through its officers and employees. The negligence of employees in carrying out that business is the responsibility of the corporate body. If as a group the same employees continue, without pause to produce the same products in the same plant, with the same supervision, the ownership of the entity which amintains essentially the same name cannot be the sole controlling determinant of liability.
 
 
 33
 If it be argued that liability is thus made open-ended, as in the case of accidents following a long lapse of time from the date of sale, we note that even the original manufacturer may be subject to such liability or, if not, the successor could mount the same defenses of age and obsolescence. Whatever may be the outer limit of liability on a successor, the district court did not err in refusing to rule as a matter of law that B. Offen & Co., Inc. was immune from liability.
 
 III
 
 34
 Hoe also challenges the failure of the district court to direct the jury to apportion liability between the defendants under the New Hampshire comparative negligence statute:
 
 
 35
 'where recovery is allowed against more than one defendant, each such defendant shall be liable for that proportion of the total dollar amount awarded as damages in the ratio of the amount of his causal negligence to the amount of causal negligence attributed to all defendants against whom recovery is allowed.' RSA Ch. 507, 7-a.
 
 
 36
 Hoe's requested instructions[17] sought such apportionment on both the count of negligence and strict liability. It is clear that the relative negligence of the defendants is not a relevant inquiry where strict liability is concerned. Strict liability is imposed irrespective of a defendants' negligence. The court properly denied the instruction as requested. Hoe failed to argue here or before the district court that the instruction should be separated or that the grounds supporting it were different in the negligence and strict liability claims. Even assuming arguendo that the direction as to negligence was incorrect, 'In fairness to the trial court and to the parties, objections . . . must be sufficiently specific to bring into focus the precise nature of the alleged error. Where a party might have obtained the correct charge by specifically calling the attention of the trial court to the error . . . he may not through a general exception obtain a new trial', Palmer v. Hoffman, 318 U.S. 109, 119, 63 S.Ct. 477, 483, 87 L.Ed. 645 (1942). Furthermore, no miscarriage of justice occurs, since apportionment of the $45,000 damage award on the negligence count would not bar plaintiffs' recovery of the full $45,000 award in strict liability.
 
 
 37
 In order to obtain a similar result, Hoe argues that it is entitled to indemnity from Offen on both the strict liability and negligence counts. But the district court directed the jury that it could find Hoe liable in negligence only if it rejected the claim that Hoe had no responsibility for the ovens, if it found that Hoe had a duty to inspect and improve the completed press including the ovens and to discover and do something about the defect and if it further found that Hoe failed to exercise ordinary care due. In light of the jury finding of negligence it cannot be said that Hoe's liability was only passive or vicarious. United Air Lines, Inc. v. Wiener, 335 F.2d 379 (9th Cir. 1964); Fidelity & Cas. Co. of New York v. J. A. Jones Const. Co., 325 F.2d 605 (8th Cir. 1963); Derry Electric Co. v. New England Telephone & Telegraph, 31 F.2d 51, 52 (1st Cir. 1929). The argument that Hoe was entitled to recover against Offen in strict liability is frivolous as the plain language of 402A Restatement of Torts 2d, creates liability only to the ultimate user or consumer. The court properly dismissed the cross-claim of Hoe against Offen after trial.[18]
 
 IV
 
 38
 Hoe finally appeals from dismissal of its third-party action, separately tried before the court subsequent to the trial of the issues discussed above. Hoe sued Rumford on the basis of the contract of sale for Press No. 79, contending that the contract provided that Rumford would indemnify Hoe and that such indemnification extended to negligence on Hoe's part. The clause in question provided:
 
 
 39
 'Buyer (Rumford) agrees to indemnify Hoe and save it harmless from any and all liability for injury to persons (other than Hoe's own employees) or property, which may result from any cause whatsoever after the machinery herein is delivered to Buyer. F.O.B. Hoe's plant, New York City.'
 
 
 40
 The contract was to be governed by New York law.
 
 
 41
 The contract has substantial ambiguities. It was made up of two documents. The first, including the indemnity clause, recited that Hoe sold to Rumford 'the machinery herein' and then set forth the items that were so described. The Offen ovens were not included. In a separate document where the Offen ventilating and drying system was listed as 'auxiliary equipment', no indemnification clause was included. New York law indicates that indemnification contracts are to be narrowly construed and all ambiguity is to be resolved against indemnity. See, e.g., Phillip Wick Co., Inc. v. Lee Dyeing of Johnstown, Inc., 71 Misc.2d 82, 335 N.Y.S.2d 619 (1972); Willard Van Dyke Production, Inc. v. Eastman Kodak Co., 12 N.Y.2d 301, 239 N.Y.S.2d 337, 189 N.E.2d 693 (1963). The district court ruling that the clause did not cover the Offen ovens was not clearly erroneous.
 
 
 42
 The judgment in favor of Alphonse Cyr, Jr. against R. Hoe & Co., Inc. is modified to limit recovery to $45,000. The judgment in favor of Alphonse Cyr, Jr. against B. Offen & Co., Inc. is modified to limit recovery to $45,000. The decision below is in all other respects affirmed.
 
 
 
 [1]
 The defendants asserted that the press rollers were supposed to be cleaned by using poles with rags attached from outside the ovens. There was substantial evidence, however, that caked-on ink could not be removed in that manner, that the manufacturer and seller knew that men entered the oven to clean the rollers, and that the doors to the oven were intentionally made large enough for men to enter
 
 
 [2]
 The Couture Estate raises an equal protection challenge to the limitation on damages that can be recovered in a suit based on wrongful death under New Hampshire law, RSA Ch. 556, 14. It views the distinction as one of time only, i.e., the date that suit is brought, before or after death. But it is clear that the legislature has, in granting a right to recover which did not exist at common law, made a rational distinction between damages that go to the injured party himself and damages that go to his estate. Not only is the plaintiff a different party but there is another ground for legitimate distinction, the element of damages. As the New Hampshire Supreme Court has stated, 'damages for injuries . . . are restricted within definite limits established by the common law . . . Recovery for injuries causing death, for the benefit of survivors, however, suggests more speculative elements of damage as to which there has been a 'policy . . . of restriction' by arbitrary limit.' Burke v. Burnham, 97 N.H. 203, 84 A.2d 918 (1951)
 
 
 [3]
 Hoe argues that it cannot be held liable in strict liability, as it was not a 'seller' of ovens as defined by the Restatement, Torts 2d 402A(1)(a), adopted in Buttrick v. Lessard, 110 N.H. 36, 260 A.2d 111 (1969). Alternatively it argues that this issue should have been submitted to the jury. Hoe was one of three major suppliers of the type of press used at Rumford. All such presses require ovens and Hoe would customarily choose and include ovens to go with its presses. It frequently chose Offen ovens to make up the total package of equipment to be supplied to a purchaser. Furthermore, the contract of sale between Hoe and Rumford specifically listed the Offen drying equipment. It is clear as a matter of law that Hoe was a 'seller engaged in the business of selling such a product' as defined by 402A
 
 
 [4]
 Offen challenges the jury finding that the defect was the proximate cause of the accident. This challenge is without substance, the record revealing ample evidence to support the jury finding. Maxfield v. Maxfield, 102 N.H. 101, 51 A.2d 226 (1959)
 
 
 [5]
 The jury was instructed to record the percentage that Cyr and Couture's negligence, if any, contributed to their own injuries. This was to apply only to the count of negligence; there was to be no deduction as to strict liability
 
 
 [6]
 See, e.g., Bachner v. Pearson, 479 P.2d 319 (Alaska 1970); O. S. Stapley Co. v. Miller, 6 Ariz.App. 122, 430 P.2d 701 (1967); Barth v. B. F. Goodrich Tire Co., 265 Cal.App.2d 228, 71 Cal.Rptr. 306 (1968); Williams v. Brown Mfg. Co., 45 Ill.2d 418, 261 N.E.2d 305 (1970); Downey v. Moore's Time-Saving Equipment, Inc., 432 F.2d 1088 (7th Cir. (Ind.) 1970); Williams v. Ford Motor Co., 454 S.W.2d 611 (Mo.App.1970); Bexiga v. Havir Mfg. Co., 60 N.J. 402, 290 A.2d 281 (1972); Moomey v. Massey Ferguson, Inc., 429 F.2d 1184 (10th Cir. (N.M.) 1970)
 
 
 [7]
 'It would be anomalous to hold that the defendant has a duty to install safety devices but a breach of that duty results in no liability for the very injury the duty was meant to protect against.' Bexiga v. Havir, 60 N.J. 402, 290 A.2d 281, 286 (1972); see, e.g., Marschall, An Obvious Wrong Does Not Make a Right: Manufacturers' Liability for Patently Dangerous Products, 48 NYU L.Rev. 1065 (1973); Fletcher, Fairness and Utility in Tort Theory, 85 Harv.L.Rev. 537 (1972)
 
 
 [8]
 See Keener v. Dayton Elec. Mfg. Co., 445 S.W.2d 362 (Mo.1969)
 
 
 [9]
 Counsel have urged, pointing to recent New Hampshire Supreme Court decisions in the field of torts, that that court would not today subscribe to a more restrictive interpretation than the Restatement or the majority of jurisdictions. That may be so, but, given a recent state precedent, we cannot participate in the evolution of state law; we are restricted to applying the present law as we interpret it
 
 
 [10]
 In re Johnson-Hart Co., 34 F.2d 183 (D.Minn.1929); Abeken v. United States, 26 F.Supp. 170 (E.D.Mo.1939); Plaza Express Co. v. Middle States Motor Freight, Inc., 40 Ill.App.2d 117, 189 N.E.2d 382 (1963)
 
 
 [11]
 E.g., Malone v. Red Top Cab Co., 16 Cal.App.2d 268, 60 P.2d 543 (1936); Swing v. Am. Glucose Co., 123 Ill.App. 156 (1905)
 
 
 [12]
 Copease Mfg. Co. v. Cormac Photocopy Corp., 242 F.Supp. 993 (S.D.N.Y.1965) (patent infringement claim); Bergman v. Lefkow Ins. Ag'y & Co. v. Flash Cab Co., 110 Ill.App.2d 415, 249 N.E.2d 729 (1969) (contract liability at issue, court held it was assumed where the asserts of the predecessor were owned and controlled by the same people); American Hospital and Life Ins. Co. v. Kunkel, 71 N.M. 164, 376 P.2d 956 (1962) (liability on notes of assumed corporation); Pierce v. Riverside Mortgage Securities Co., 25 Cal.App.2d 248, 77 P.2d 226 (1938) (no contract liability where there was an assumption of assets but the old company continued and the new company did not continue to conduct its affairs, but was liquidating)
 
 
 [13]
 Shane v. Hobam, Inc., 332 F.Supp. 526 (E.D.Pa.1971) (the continuity of the company was claimed and discussed only in the context of the duty to warn and not with regard to restrict liability or negligence for creation of the defective product); Kloberdanz v. Joy Mfg. Co., 288 F.Supp. 817 (D.Colo.1968) (the claim of continuity was easily negatived; the seller corporation continued after the sale and the buyer did not adopt the name; the court rested its analysis on lack of contractual assumption of liability); McAlister v. American Ry. Express Co., 179 N.C. 556, 103 S.E. 129 (1920) (continuity was negatived by the continuing existence of the seller corporation)
 
 
 [14]
 Offen also argues that it cannot be held liable on the theory that it had a duty to warn Rumford about defects in the equipment. Plaintiffs argue on the contrary that, since Offen maintained field representatives who visited Rumford, it was under a continuing duty to give warning and that this fact constitutes a separate and distinct ground for affirmance. We do not deal with either contention, since this was not the issue given to the jury
 
 
 [15]
 See, e.g., Consolidated Rock Products Co. v. DuBois, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982 (1941); Costello v. Fazio, 256 F.2d 903 (9th Cir. 1958); Weisser v. Mursam Shoe Corp., 127 F.2d 344 (2d Cir. 1952)
 
 
 [16]
 Offen challenges the district court's failure to restrict plaintiffs' attorneys argument to the jury in commenting on the contract of sale that Offen was trying to 'hide behind a corporate deal'. While the argument was pejorative, unnecessarily attributing an improper motive to Offen's business arrangements, the district court's failure to curtail it did not amount to prejudicial error
 
 
 [17]
 The plaintiffs argue that Hoe did not make such a request below as the request for a reading of RSA Ch. 507, 7-a was made in a context of other requests regarding contributory negligence of the plaintiffs, or that other requests were for special verdicts forbidden under New Hampshire law. Hoe counters that New Hampshire law has changed permitting special verdicts. We need not reach this issue as each category of requests failed to distinguish between directions desired on the strict liability and negligence counts
 
 
 [18]
 Hoe and Offen also brought third-party actions against Rumford Press on the theory that it had a common law duty to indemnify them. Offen brought an additional action against Blanchard Press, Inc., Rumford Press Division, for indemnification. Hoe does not appeal from this ruling. Offen does. Rumford had no common law or statutory duty to discover the defect nor did any implied warranty run from Rumford to Offen. The district court properly dismissed these third-party actions