**JOHN T. CALLAHAN & SONS, INC., Plaintiff,**

v.

**DYKEMAN ELECTRIC CO., INC., Employers Insurance of Wassau A Mutual Company and Harrier Electric Co., Defendants.**

**No. CIV.A.01–11024–MBB.**

United States District Court, D. Massachusetts.

May 23, 2003.

Michael K. Crossen, Rubin & Rudman, Boston, MA, for John T. Callahan & Sons, Inc., Plaintiff.

Christopher C. Whitney, Little, Bulman, Medeiros & Whitney, Providence, RI, Robert D. Friedman, Perkins, Smith & Cohen, LLP, Boston, MA, Scott K. Pomeroy, Little, Bulman, Medeiros & Whitney, P.C., Providence, RI, for Dykeman Electric Company, Inc., Employers Insurance of

Wausau, A Mutual Company, Harrier Electric Company, Defendants.

**MEMORANDUM AND ORDER RE: DEFENDANT HARRIER ELECTRIC, INC.'S MOTION FOR SUMMARY JUDGMENT (DOCKET ENTRY # 55); MOTION OF JOHN T. CALLAHAN & SONS, INC. FOR PARTIAL SUMMARY JUDGMENT (DOCKET ENTRY # 50); MOTION FOR SUMMARY JUDGMENT IN FAVOR OF DEFENDANT EMPLOYERS INSURANCE OF WASSAU A MUTUAL COMPANY (DOCKET ENTRY # 44)**

BOWLER, Chief United States Magistrate Judge.

Pending before this court are the above styled summary judgment motions. (Docket Entry ## 44, 50 & 55). After conducting a hearing, this court took the motions under advisement.

### BACKGROUND

The present dispute concerns a subcontract for electrical work involving renovations to the Lynn English High School in Lynn, Massachusetts. Plaintiff and defendant in counterclaim John T. Callahan & Sons, Inc. ("Callahan"), the project's general contractor, entered into a $19,236,689 contract with the City of Lynn. Defendant Dykeman Electric Company, Inc. ("Dykeman") entered into the $2,127,000 subcontract with Callahan to perform electrical work. Defendant Employers Insurance of Wassau A Mutual Company ("Wassau") issued a payment bond and a performance

bond on the project naming Callahan as the obligee, Dykeman as the principal and Wassau as the surety. The penal sum on the bonds amounted to $2,127,000. Dykeman invoiced Callahan for the $21,355 cost of the payment and the performance bonds.

The performance bond triggered Wassau's performance "whenever [Dykeman] shall be, *and* declared by [Callahan] to be in *default* under the subcontract."[1] (Docket Entry # 64, Ex. D; emphasis added). The performance bond therefore required a default by the principal (Dykeman) and a declaration of default by the obligee (Callahan). A default under the subcontract occurred, *inter alia*, "if a receiver is appointed on account of the Contractor's insolvency." (Docket Entry # 64, Ex. C, ¶ 14.2).[2] Callahan therefore had the ability to declare Dykeman in default at the time of the May or June 1999 appointment of a receiver, described below, but chose not to make such a declaration until October 2000.

To protect its exposure, Wassau required Dykeman, its two principals (Thomas C. Dykeman and Christopher Dykeman) and their spouses (Constance and Linda Dykeman) to execute a general indemnity agreement. The indemnitors, including Dykeman, pledged the machinery and equipment at the work site as security. Under the agreement, if Wassau established a reserve to cover "any liability, claim asserted, suit or judgment under" a bond, then Wassau could demand that the indemnitors, including Dykeman, deposit an equal sum of money as collateral security regardless of whether Wassau had

---

1. The bond also conditioned Wassau's obligations on Callahan's performance of its obligations.

2. The above quote is taken from the general conditions of the contract between the City of Lynn and Callahan. Under the subcontract, Dykeman agreed to "assume to the Contractor [Callahan] all the obligations and responsibilities that the Contractor [Callahan] by those documents [which included the general conditions] assumes to the City of Lynn." (Docket Entry # 64, Ex. B).

made a payment on either bond. (Docket Entry # 42, Ex. A).

Wassau therefore had the ability to file a claim with the receiver in October 2000 when Callahan "asserted" its claim and declared Dykeman in default. At that time, which was prior to the March 2001 dissolution, the receiver still retained the proceeds from the February 2000 sale of Dykeman's assets. Accordingly, before Dykeman formally dissolved, Wassau could have filed a claim with Dykeman's receiver together with a motion to extend the October 25, 1999 deadline for filing claims and requested that the proceeds of any sale of Dykeman's assets be deposited with Wassau in an amount equal to Wassau's reserve. There is little indication that Wassau availed itself of these protections.

The construction project did not proceed smoothly or on schedule. On May 20, 1999, Dykeman filed for receivership protection under Rhode Island law in Rhode Island Superior Court ("the Rhode Island court"). The Rhode Island court immediately appointed a temporary receiver[3] and restrained the filing of any lawsuit against Dykeman. The receiver's powers, set forth in the appointment order, endowed him with the ability to conduct Dykeman's business, take possession of Dykeman's assets and prevent the cancellation of any contract with Dykeman.[4] With respect to Wassau's authority under the general indemnity agreement to take possession of the work under the subcontract,[5] a June 28, 1999 order by the receiver barred any party from taking possession of "any property in the possession of [Dykeman]" with-

out the receiver's prior approval. (Docket Entry # 14, Ex. B).

Within a week, Wassau learned of the state court filing and shortly thereafter obtained the receivership papers. L. Neal Foxhill ("Foxhill"), an assistant vice president in charge of Wassau's bond claim department, spoke with Christopher Dykeman as well as with a lower level Wassau employee. In memoranda dated May 26 and 28, 1999, Foxhill acknowledged the "serious deterioration" of Dykeman's assets and financial condition as well as the delays and difficulties at the project site. (Docket Entry # 64, Ex. J & K). At some point in time, Foxhill established a reserve and completed a reserve report. Foxhill also wrote a June 2, 1999 letter to Dykeman and the individual indemnitors demanding their indemnification under the general indemnity agreement and urging them to prioritize the completion of work on the bonded project as opposed to on any unbonded work. Foxhill did not demand that the indemnitors match the amount of any Wassau funds held in reserve. Dykeman proved cooperative in encouraging the receiver to use Lynn English progress payments to pay Lynn English materialmen and laborers.

By letter dated June 3, 1999, Foxhill told the receiver that Wassau had a contingent claim for an undetermined amount because of its obligation to pay completion costs for the Lynn English project under the performance and payment bonds. (Docket Entry # 47, Ex. C). Wassau did not file a formal claim for a specified amount. Likewise, Callahan never submit-

---

3. The Rhode Island court appointed a permanent receiver on June 10, 1999.

4. By statute, the Rhode Island court has the "power to appoint a receiver, with any powers and duties that the court, from time to time, directs." R.I. Gen. Laws § 7–1.1–97.1.

5. If there was a "default in the performance of the contract," the general indemnity agreement gave Wassau the ability to "take possession of the work under the contract." (Docket Entry # 64, Ex. G).

ted a proof of claim to the receiver. (Docket Entry ## 46 & 65, ¶¶ 65).

Callahan, concerned about Dykeman's plans to complete the project, called a June 25, 1999 meeting to discuss the receivership filing. Christopher Dykeman, his attorney, Stephen Callahan, Steven J. Loeper ("Loeper"), Callahan's project manager, Callahan's attorney and Mike Baxter ("Baxter") of Wassau attended the meeting. Christopher Dykeman assured the group that Dykeman would complete the work. Participants were also advised that parties might bid for Dykeman's assets [6] as well as its ongoing contracts and that Christopher and Thomas Dykeman,[7] in addition to three other suitors, were interested. In short, Dykeman would continue to work on the project, "be put out to bid" and "bought as a going concern." (Docket Entry # 64, Ex. N). Although present, Baxter did not participate in the discussions.

Around this time period, Wassau recognized that Dykeman was not in default because Callahan had not declared Dykeman's default. Specifically, an internal Wassau memorandum explains that "since Dykeman is not in default, [Wassau would have] no speaking role [at the June 25th meeting], but we can offer encouragement to the parties to the contract to keep moving forward." (Docket Entry # 64, Ex. O; Docket Entry # 66, Ex. C). According to Wassau, Callahan "was not going to con-

sider the filing of the receivership an act of default." (Docket Entry # 64, Ex. N). Just prior to the June 25th meeting, Loeper voiced his concern to Foxhill that Dykeman's filing for receivership might constitute an act of default under the subcontract. Loeper wanted to know what would happen if Callahan declared a default and a successor company purchased Dykeman and completed the subcontract. Foxhill told Loeper "that a successor company would not have the benefit of [the performance and payment] bonds and would have to provide its own bonds." (Docket Entry # 48, Foxhill Deposition, p. 75;[8] Docket Entry # 49, Ex. D).

In the summer of 1999, Dykeman's work on the project slowed or halted at various times due to poor design, scheduling and planning.[9] In August or September 1999, Christopher Dykeman prepared a summary of Dykeman's increased costs to present to the city as part of Callahan's global reimbursement claim. Dykeman continued to remain on the project in the fall of 1999 and the winter of 2000.

On January 27, 2000, the receiver notified Callahan and Wassau, as well as other Dykeman creditors, of an offer to purchase Dykeman's assets for $606,000 by defendant Harrier Electric Company ("Harrier"), a recently formed corporation whose officers, principals and/or stockholders were also Dykeman's principals.[10] The

---

6. Wassau therefore had notice that the security pledged in the general indemnity agreement might be sold.

7. An internal Wassau memorandum reflects that Christopher Dykeman contemplated a sale "that looks pretty much like the old company." (Docket Entry # 61, Ex. I).

8. The transcript of the deposition does not have an exhibit number and is placed backwards in the relevant filing.

9. This disputed fact is viewed in favor of Wassau with respect to Callahan's summary judgment motion and in favor of Callahan with respect to Wassau's summary judgment motion.

10. Thomas and Christopher Dykeman each owned 50% of the shares of Dykeman. Thomas Dykeman became President of Harrier whereas Christopher Dykeman became Vice President and Secretary. Thomas Dykeman and Christopher Dykeman's spouse, Linda Dykeman, each own 49% of the shares of Harrier.

trustee also notified Callahan and Wassau of the offer of Netlectric Realty LLC ("Netlectric")[11] to purchase other Dykeman assets and real estate for $184,000. The purchase price for the assets and the real estate totaled $790,000. The notice sent to Wassau, Callahan and other Dykeman creditors included the receiver's petition to approve the sale of the assets free and clear of all liens, including the sale of the machinery and equipment pledged to Wassau under the general indemnity agreement. There is no indication that either Wassau or Callahan objected to the proposed sale.[12]

The petition to sell the assets free and clear of liens advised Wassau, Callahan and other interested parties that the transfer of any release on their part would be without prejudice to proceed with a claim against the proceeds of the sale. The order allowing the petition to sell confirmed that any party claiming an interest in the assets of Dykeman retained and did not waive the right to claim an interest in the sale proceeds of $790,000.

The petition also referred to the attached offer in which Harrier agreed to assume all of Dykeman's "obligations in connection with any contracts ... which exist on the date of the Closing." (Docket Entry # 69, Ex. B). The subcontract between Callahan and Dykeman, however, prohibited the subcontract's assignment "without written consent" of the other party.[13] (Docket Entry # 64, Ex. C, ¶ 13.2.1).

On February 14, 2000, after prior notice and a hearing, the trustee sold Dykeman's assets to Harrier for $606,000 and Dykeman's additional assets including real estate to Netlectric for $184,000. In a proposed letter agreement dated February 24, 2000, Harrier asked Callahan to consent to the assignment of the subcontract from Dykeman to Harrier. Callahan never signed the proposed agreement. Hence, although Dykeman, by filing for receivership, placed its assets, including the subcontract, in the hands of the receiver who then sold the assets, purportedly including the subcontract to Harrier, the subcontract prohibited such an assignment without Callahan's consent.

In order to raise sufficient funds and obtain a loan for the $790,000 purchase, the individual indemnitors of Wassau (Thomas, Christopher, Constance and Linda Dykeman) pledged and encumbered their assets to First International Bank ("First International") in return for a loan of $780,000. In conjunction with the loan, First International obtained personal guarantees from each of the four individual indemnitors secured by third and fourth mortgages on their personal residences and security interests in their tangible and intangible property.[14]

---

11. Linda and Thomas Dykeman are members of Netlectric. In notices to creditors regarding the proposed sales, the trustee describes Harrier and Netlectric as having principals who are also Dykeman's principals. As evidenced on the schedules attached to the notices, the trustee sent the notices to Foxhill of Wassau and Callahan's attorneys, Rubin and Rudman, LLP.

12. Wassau presently argues that there was a material change in the bond obligations and that it suffered prejudice when the individual indemnitors depleted their available assets to purchase Dykeman.

13. The above quote is taken from the general conditions applicable to the contract between the City of Lynn and Callahan. Under the terms of the subcontract, Dykeman and Callahan assumed this obligation.

14. In order to bolster its argument of prejudice, Wassau admits that any recourse the company may have had against the individual indemnitors became subordinate and inferior to the security interests, mortgages and life insurance assignments issued to First International.

On February 24, 2000, Foxhill wrote a letter to Christopher and Thomas Dykeman asking them about their "intentions concerning the completion of the uncompleted bonded work." (Docket Entry # 73, Ex. B). Foxhill stated that he had read the petition to sell Dykeman's assets to Harrier and Netlectric and noted that Christopher and Thomas Dykeman were principals. He then reminded them of their obligations under the general indemnity agreement as well as Dykeman's obligations and that Wassau would look to them personally as well as to the company for any loss suffered as a result of issuing the bonds.

After acquiring Dykeman's assets by virtue of the February 14, 2000 sale, Harrier or Dykeman in receivership[15] performed electrical work at the site until October 2000 without an express assignment of the contract from Callahan. Loeper, Callahan's Rule 30(b)(6) deponent and the senior project manager, testified that Callahan never had a contract with Harrier "in writing or otherwise." (Docket Entry # 57, Ex. A). He nevertheless believed that Harrier was "an extension of Dykeman."[16] (Docket Entry # 61, Ex. D). Similarly, a city official who worked at the site at an undetermined time had "never heard of Harrier" in connection with the project. (Docket Entry # 61, Ex. O). Stephen Callahan as well as Dennis Sheehan, another Callahan official, agreed with

Loeper's testimony that Callahan never had a contract with Harrier and that Harrier was therefore not at the job site.[17] Indeed, Loeper further testified that Callahan made a conscious choice not to agree to the proposed assignment of the subcontract to Harrier. As an explanation for Callahan's failure to agree to the assignment, Loeper testified that he preferred to avoid the administrative difficulty of issuing a new contract to a new entity such as Harrier and ensuring that the terms were agreeable to both parties.

After the February 2000 purchase of Dykeman's assets, Harrier used the same business address, telephone number and facsimile number as Dykeman. Harrier also filed a fictitious name statement allowing Harrier to do business under the name of Dykeman Electrical Contractors.[18] After February 2000, Harrier continued using Dykeman letterhead in correspondence with Callahan. Callahan paid Harrier with checks issued to "Dykeman Electric Co."

In or around September 2000 Harrier stopped working on the project. Harrier accuses Callahan of not paying Harrier for its work in a timely manner and of attempting to settle Callahan's claims with the city to the disadvantage of the subcontractors' claims that Callahan sponsored. In light of Harrier's departure, Callahan contracted with a replacement contractor, Annese Electrical Services ("Annese").

---

**15.** It is a genuine issue of material fact as to whether Harrier or Dykeman operating in receivership performed the work from the time of the February 2000 sale to the October 2000 notice of default.

**16.** In late April and early May 2000 Loeper also asked Christopher Dykeman to submit a revised claim for Dykeman's damages to support Callahan's claim against the city.

**17.** It is Callahan's theory that Dykeman and Harrier were indistinguishable under a de

facto merger doctrine or that Harrier was a mere continuation or the alter ego of Dykeman. As set forth in the complaint, Callahan seeks liability against Harrier for breach of the subcontract between Dykeman and Callahan.

**18.** Callahan lacked actual knowledge of the April 10, 2000 filing at the time. Christopher Dykeman does not remember a conversation in which he told anyone at Callahan that Harrier would be using the Dykeman name.

Annese had also never heard of Harrier. (Docket Entry # 61, Ex. P).

On October 6, 2000, Callahan notified Wassau of Dykeman's default. Callahan declared Dykeman in default "by virtue of its failure to complete the project and by walking off the job on October 6, 2000." (Docket Entry # 64, Ex. U).

On March 12, 2001, a final judgment issued dissolving Dykeman. The Rhode Island court's March 12, 2001 final judgment approved and ratified the trustee's January 29, 2001 final report which sought Dykeman's dissolution and the court's approval of certain claims. (Docket Entry # 14, Ex. D). A court decree dissolving a Rhode Island corporation ceases the existence of the corporation for purposes of its ability to sue and be sued. R.I. Gen. Laws §§ 7–1.1–95 & 7–1.1–98. A dissolved corporation may continue to exist for a two year period after dissolution for the limited purpose of winding up its affairs. R.I. Gen. Laws § 7–1.1–98.1.

On March 20, 2001, Callahan filed suit against Dykeman, Harrier and Wassau. This court allowed Dykeman's motion to dismiss inasmuch as it is no longer amenable to suit as a judicially dissolved corporation. Harrier presently moves for summary judgment on counts VII, VIII and IX. As pled, these counts uniformly require the existence of an effective assignment of the subcontract.[19] Harrier therefore argues that the counts depend upon the existence of a valid assignment of the subcontract from Dykeman to Harrier, which is lacking, or the existence of a contract between Harrier and Callahan, which Callahan's Rule 30(b)(6) witness denies. Callahan asserts that Harrier nevertheless incurs successor liability because: (1) there was a de facto merger; (2) Harrier is a mere continuation of Dykeman; and/or (3) Harrier is the alter ego of Dykeman.[20]

Wassau moves for summary judgment on counts IV, V and VI[21] on the basis that its rights under the bond were materially and prejudicially changed when Callahan failed to declare Dykeman in default and the sale of Dykeman's assets depleted the corporate and individual indemnitors' assets. According to Wassau, by choosing not to declare Dykeman in default in May 1999 at the time of the receivership filing, Callahan waived its right to collect under the performance bond.

In addition to opposing Wassau's summary judgment motion, Callahan moves for summary judgment to preclude Wassau from disclaiming liability on the basis

19. Count VII alleges a breach of the subcontract to the extent Dykeman effectively assigned the subcontract. Count VIII alleges a breach of the implied covenant of good faith in the subcontract to the extent Dykeman effectively assigned the subcontract. Count IX alleges a violation of Massachusetts General Laws chapter 93A ("chapter 93A") to the extent Dykeman effectively assigned the subcontract.

20. Because these claims fail on the merits, this court need not address Harrier's procedural argument that the complaint does not encompass such claims. Rather, for purposes of argument only, this court assumes that the complaint encompasses such claims. *See Attorney General v. M.C.K., Inc.*, 432 Mass. 546,

736 N.E.2d 373, 382 n. 24 (2000) (although applying Massachusetts law, court rejected the defendants' claim that the doctrine of corporate disregard could not be applied "because the Commonwealth failed to assert this theory in the original complaint"). It is nevertheless worth noting that the complaint does not request equitable relief.

21. Count IV seeks a declaratory judgment regarding the parties' obligations under the performance bond. Count V alleges Wassau's breach of the performance bond and Count VI alleges Wassau's violation of chapter 93A due to Wassau's failure to honor its obligations under the performance bond.

that Callahan failed to declare a default in a timely manner or that it provided late notice of the default to Wassau.

## DISCUSSION

### I. DEFENDANT HARRIER ELECTRIC, INC.'S MOTION FOR SUMMARY JUDGMENT (DOCKET ENTRY # 55)

■ Harrier moves for summary judgment on the basis that all of the relevant counts require an effective assignment of the subcontract from Dykeman to Harrier. (Complaint, ¶¶ 61, 67 & 71). Neither party, however, elucidates the law relative to whether Dykeman, operating under state receivership, effectively sold or transferred the subcontract to Harrier.

Rhode Island law endows the Rhode Island court with "full power to liquidate the assets and business of a corporation." R.I. Gen. Laws § 7–1.1–90. The relevant Rhode Island statute expressly gives the Rhode Island court broad equitable powers including the power to appoint a receiver. *See In Re Newport Offshore, Ltd.,* 219 B.R. 341, 347–348 (Bkrtcy.D.R.I.1998) ("[t]he Rhode Island court exercises broad equity powers in appointing and supervising general, liquidating receivers"). Section 7–1.1–91(f) vests the Rhode Island court "with 'exclusive jurisdiction of the corporation and its property, wherever situated, and of all questions . . . concerning the same.'"[22] *In Re Newport Offshore, Ltd.,* 219 B.R. at 348 (quoting R.I. Gen. Laws § 7–1.1–91); *accord* 16A William Meade Fletcher *Fletcher Cyclopedia Corporations* § 8207 (1995) (permanent re-

ceiver of corporation appointed under state statute acquires full title to property and choses in action of the corporation).

The statute also gives the receiver the authority "to compromise any dispute" and thereby authorized the receiver to compromise the contractual dispute between Callahan and Dykeman. The receiver also had the power to sell and dispose of any corporate asset, "to carry on [the corporation's] business" and to perform "all other acts which might be done by the corporation." R.I. Gen. Laws § 7–1.1–91.

Given the foregoing authority, it is apodictic that the court and the permanent receiver thereby acquired the assets of Dykeman upon the filing for receivership and the appointment of a permanent receiver. The receiver also had the power to transfer or sell the assets of Dykeman including contracts.

■ It is equally true, however, that, "A receiver takes, as under any other assignment by operation of law, only the property and effects as the corporation held, was possessed of or entitled to for its own benefit." 16A William Meade Fletcher *Fletcher Cyclopedia Corporations* § 8207 (1995). The subcontract held by Dykeman prohibited an assignment of the contract without the written consent of the other party. Dykeman and therefore the receiver by operation of law did not have the power to assign the subcontract to Harrier without Callahan's written consent.[23]

At the time Dykeman filed for state supervision, it did not have the written consent of Callahan to assign the contract.

---

**22.** This court need not determine whether title remained inchoate until dissolution which, in light of the language in section 7–1.1–91, this court doubts. *See* R.I. Gen. Laws § 7–1.1–91(d) ("receiver . . has authority subject to court order . . . to sell, convey, and dispose of all or part of the assets of the corporation").

**23.** Separate and apart from this issue is whether the receiver had the power to sell Dykeman's assets to Harrier free and clear of successor liability for Callahan's pre-existing breach of contract claim against Dykeman.

Nor is there any evidence that the receiver requested Callahan to execute such an assignment prior to the March 2001 dissolution. Instead, the evidence is entirely to the contrary. When Harrier proposed a written assignment, Callahan declined to execute the proposed letter agreement.

A similar nonassignability clause barred the appointed receiver in *In re Lascoff*, 116 N.Y.S.2d 731 (1952), from transferring a contract to an offeror. In no uncertain terms the *Lascoff* court stated that, "the receiver cannot undertake to transfer the lease to the offeror" because of "the nonassignability clause in the lease." *In re Lascoff*, 116 N.Y.S.2d at 732. Like the receiver in *Lascoff*, Dykeman's receiver therefore lacked the authority to assign or convey the subcontract to Harrier. Accordingly, when Harrier purchased the assets from the receiver, the assets did not include the subcontract.

During oral argument, Harrier maintained that the evidence did not suggest either an express or an implied contract between Harrier and Callahan. Loeper testified that the parties did not have a contract, written or otherwise. Faced with such evidence and with Harrier hav-ing more than met its initial summary judgment burden of production, *see Dow v. United Brotherhood of Carpenters and Joiners of America*, 1 F.3d 56, 58 (1st Cir.1993) (once moving party makes proper showing as to " 'absence of evidence to support the nonmoving party's case,' the burden of production shifts to the nonmovant"), it falls on Callahan, as the summary judgment target with the underlying burden of proof, to "affirmatively point to specific facts that demonstrate the existence of an authentic dispute." *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995).

■ Callahan fails to point to evidence of an effective assignment and/or the existence of an express or implied contract between Callahan and Harrier.[24] Rather, Callahan relies on equitable theories of successor liability to preclude summary judgment. Absent liability under these equitable theories, summary judgment is otherwise proper on counts VII, VIII and IX, all of which require the existence of an effective assignment of the subcontract or an express or implied contract containing an implied covenant of good faith.[25]

---

**24.** For example, Callahan does not argue that Harrier's conduct in performing work at the project after the February 2000 purchase amounted to an implied in fact contract. By relying exclusively on the successor liability and alter ego theories to defeat summary judgment, the express or implied breach of contract claims are subject to summary judgment.

**25.** Count IX alleges a violation of chapter 93A. Harrier moves for summary judgment on the chapter 93A count and identifies the absence of evidence to support the claim. Callahan fails to address the claim either in its papers or at oral argument. As the party with the underlying burden of proof on the chapter 93A claim, Callahan therefore fails to meet its summary judgment burden of production thus mandating summary judgment on this count.

Alternatively, the summary judgment records fails to provide sufficient evidence of conduct rising to the level of a section 11 violation. Callahan's delay did not amount to an extortionate breach of the terms of the performance bond or otherwise constitute an unfair act or practice within the meaning of chapter 93A. *See Commercial Union Insurance v. Seven Provinces Insurance Co.*, 217 F.3d 33, 40 (1st Cir.2000) ("mere breach of contract does not constitute an unfair or deceptive trade practice ... unless it rises to the level of 'commercial extortion' or a similar degree of culpable conduct"), *cert. denied*, 531 U.S. 1146, 121 S.Ct. 1084, 148 L.Ed.2d 959 (2001); *Anthony's Pier Four v. HBC Associates*, 411 Mass. 451, 583 N.E.2d 806, 821 (1991) ("conduct 'in disregard of known contractual arrangements' and intended to secure benefits for the breaching party constitutes an unfair act or practice for c. 93A purposes");

Turning to the aforementioned equitable theories, Harrier asserts that the judicially approved statutory sale of assets free and clear of liens extinguishes any successor or alter ego liability on the part of Harrier for the conduct of Dykeman. Harrier points out that allowing Callahan to proceed with a successor liability or alter ego theory would render the receivership protections nugatory and unfairly prejudice Dykeman shareholders and creditors who filed claims with the receiver. Neither Callahan's opposition,[26] Harrier's reply brief or the parties' oral arguments cite relevant law regarding the effect of the state receivership and the judicially approved sale of assets on Callahan's successor liability and alter ego claims. Although not without guidance, see Ed Peters Jewelry Co. v. C & J Jewelry Co., 124 F.3d 252, 267 n. 15 (1st Cir. 1997); In Re Savage Industries, Inc., 43 F.3d 714, 722–723 (1st Cir.1994), the issue is one of first impression in this circuit.

The parties agree that Rhode Island law applies. (Docket Entry # 77, p. 22). This court therefore defers to this reasonable assumption. See Foster–Miller, Inc. v. Babcock & Wilcox Canada, 210 F.3d 1, 8 (1st Cir.2000) (giving effect to parties' reasonable agreement as to governing law without further choice of law analysis).

For Harrier to succeed on summary judgment, the Rhode Island court must have had the power to transfer the assets free and clear of successor liability claims to Harrier and it must have exercised that power by transferring the assets free and clear of Callahan's successor liability claim. As explained in the next two subsections, a

genuine issue of material fact arises with respect to the second requirement and summary judgment is therefore improper on this basis.

Harrier also succeeds on summary judgment, however, if it cannot be held liable as a successor of Dykeman's under Rhode Island law. As explained in the third subsection, Harrier is not liable as a matter of law as a successor or alter ego of Dykeman.

*1. The Rhode Island Court's Authority*

■ The Rhode Island court's power to extinguish successor liability claims emanates from the broad language of the relevant statutes governing receivership and liquidation. The statute gives the court "full power to liquidate the assets and business of a corporation." R.I. Gen. Laws § 7–1.1–90. Once the corporation files for receivership, the court "has exclusive jurisdiction of the corporation and its property." R.I. Gen. Laws § 7–1.1–91(f). Significantly, the statute also gives a liquidating receiver the authority "to compromise any dispute or controversy." R.I. Gen. Laws § 7–1.1–91(d). Finally, guided "by the statutory rules applicable to the payment of debts in insolvency and bankruptcy," the court may prescribe the priority of creditors' claims. *Leonard Levin Co. v. Star Jewelry Co.*, 54 R.I. 465, 175 A. 651, 652 (1934).

■ The foregoing express power to collect money from the sale of assets, distribute the proceeds and determine controversies necessarily implies the equitable

---

*Sunoco, Inc. v. Makol*, 2002 WL 991703 at *7–8 (D.Mass. May 10, 2002) (allowing the plaintiff summary judgment on the defendant's chapter 93A counterclaim grounded upon breach of contract). A reasonable fact finder could not find in Callahan's favor based on the present record.

**26.** Harrier is correct inasmuch as the cases cited in Callahan's brief regarding these equitable theories of recovery do not involve the circumstance at issue in this case, to wit, a judicially approved sale of assets.

power to extinguish claims. *See Van Huffel v. Harkelrode,* 284 U.S. 225, 227–229, 52 S.Ct. 115, 76 L.Ed. 256 (1931). Thus, notwithstanding the absence of an express power to sell assets free and clear of claims,[27] the Rhode Island court has the implied power to sell assets free and clear of creditors' claims in a private sale made after notice and an opportunity to be heard.[28] Such claims include successor liability claims based in contract where, as here, the creditor/claimant had prior notice of the sale and failed to object.

■■■ In reaching this conclusion, it is worth noting that an intervening foreclosure sale does not afford an acquiring corporation such as Harrier protection from successor liability. *See Ed Peters Jewelry Co. v. C & J Jewelry Co.,* 124 F.3d at 267. Likewise, an intervening corporate dissolution by a shareholder vote and the subsequent filing of articles of dissolution with the state does not exempt the purchaser of corporate assets from successor liability. *See Casey v. San–Lee Realty,* 623 A.2d 16, 17 & 19 (R.I.1993) (analyzing existence of adequate consideration for transfer of assets as part of corporate dissolution plan under *Baker's*[29] second factor without finding that such a transfer automatically precluded successor liability of transferee).

The present asset sale, however, is distinguishable because it occurred under the auspices of the state receivership proceeding and the Rhode Island court's approval of that sale. Such a sale is more akin to a sale of assets free and clear of any "interest" in the property of the debtor under the Bankruptcy Code. *See* 11 U.S.C. § 363(f).

In sum, the Rhode Island court has the authority and the power to terminate Harrier's contractually based successor liability to Callahan by selling assets free and clear of such claims. The Rhode Island statute endows the receiver with such authority. The receiver gave Callahan notice of the sale and the Rhode Island court conducted a hearing before approving the

27. In contrast, the Bankruptcy Code expressly gives the court the power to sell a debtor's assets free and clear of any "interest" in the property of the debtor. 11 U.S.C. § 363(f). A bankruptcy sale under 11 U.S.C. § 363(f) thereby authorizes asset sales free and clear of liens and any "interest in" the property of the debtor. The modern trend is toward an expansive reading of "interest[s] in property" that is not circumscribed or strictly confined to in rem interests in the debtor's property. *In re Trans World Airlines, Inc.,* 322 F.3d 283, 288 (3rd Cir.2003) (interest in property encompassed employees' rights to travel vouchers received as settlement; employment discrimination claims constituted "interest[s] in property" and bankruptcy sale of assets was therefore free and clear of successor liability for such claims). Under this trend "interest[s] in property" may encompass " 'other obligations that may flow from ownership of the property.' " *In re Trans World Airlines, Inc.,* 322 F.3d at 288. Under the Bankruptcy Code, such interests arguably include successor liability claims by unsecured creditors. *See Ed Peters Jewelry Co. v. C & J Jewelry Co.,* 124 F.3d at 267 n. 15 (distinguishing extinction of successor liability claims during bankruptcy proceedings from survival of such claims post foreclosure proceedings).

28. Private sales such as the one in the case at bar, albeit occurring during state receivership, "require court approval." Tobias M. Lederberg *An Overview of Rhode Island Receiverships: Theory and Practice* 45 R.I.B.J. 9, 11 (1997). The receiver adhered to the customary procedure and filed a petition to sell the assets with the Rhode Island court. *See* Tobias M. Lederberg *An Overview of Rhode Island Receiverships: Theory and Practice* 45 R.I.B.J. 9, 11 (1997) (court "approval is usually obtained by the receiver filing a petition to sell assets with the court"). He also notified Dykeman's creditors and other interested parties of the hearing and the proposed sale thereby giving them the opportunity to appear and object to the sale.

29. *H.J.Baker & Bro., Inc. v. Orgonics, Inc.,* 554 A.2d 196, 205 (R.I.1989).

sale. In such circumstances, any exercise by the Rhode Island court of that power of sale would have been valid to extinguish Harrier's successor liability to Callahan.

### 2. The Rhode Island Court's Exercise of the Power to Sell Assets Free and Clear

The Rhode Island court's order approved the asset sale to Harrier free and clear of all liens and claims "upon the terms and conditions set forth in the *Offer* annexed hereto and incorporated herein." (Docket Entry # 14, Ex. C). Under the referenced and attached offer, Harrier expressly agreed to assume the contractual liabilities of Dykeman. The prohibition against assignment only operated to prevent the transfer of the subcontract as opposed to the transfer of successor liability. Other than the particular obligations of the subcontract, the offer therefore contemplated Harrier's assumption of Dykeman's contractual obligations.

Consequently, the court approved a sale that, on its face, made Harrier liable for Dykeman's contractual obligations. The language of the offer incorporated into the Rhode Island court's order belies an intent to extinguish contract based successor liability claims. Furthermore, there is little indication that the receiver submitted the general terms and conditions of the subcontract to the Rhode Island court. At a minimum, a rational fact finder or this

court as a preliminary matter could find in Callahan's favor.[30]

### 3. Harrier's Successor Liability under Rhode Island Law

■ Harrier next submits that it is not liable as a successor or alter ego under Rhode Island law. Both parties agree that as to successor liability, "a company that purchases the assets of another is [generally] not liable for the debts of the transferor company." *H.J.Baker & Bro., Inc. v. Orgonics, Inc.*, 554 A.2d 196, 205 (R.I. 1989).

■ This general rule is subject to the following four, widely recognized exceptions:

(1) when the purchasing corporation expressly or impliedly agreed to assume the selling corporation's liability; (2) when the transaction amounts to a consolidation or merger of the purchaser and seller corporations; (3) when the purchaser corporation is merely a continuation of the seller corporation; or (4) when the transaction is entered into fraudulently to escape liability for such obligations.

*Dayton v. Peck, Stow and Wilcox Co.*, 739 F.2d 690, 692 (1st Cir.1984) (internal quotation marks omitted); *accord Cyr v. B. Offen & Co., Inc.*, 501 F.2d 1145, 1152 (1st Cir.1974).[31] Callahan relies on the second

---

**30.** Because the result is the same, this court need not determine at this juncture whether the issue of the Rhode Island court's intent to extinguish the successor liability claims is for this court to decide as a fact finder, for this court to decide as a preliminary matter before charging the jury, or for the jury to decide as the fact finder.

**31.** *Cyr* is distinguishable because it involved an attempt by a tort claimant to recover for an industrial accident preceding the sale of assets to a successor corporation with a similar name. Extending its reasoning to impose

contractual liability on a successor is therefore problematic. The court explicitly distinguished the case from a successor's liability for the contractual obligations of its predecessors. *Cyr v. B. Offen & Co., Inc.*, 501 F.2d at 1152 n. 12. The court further noted that, "where tort liability is concerned, we should look to factors relevant to the specific claim and not be bound by the factors that control where other debts and liabilities are concerned." *Cyr v. B. Offen & Co., Inc.*, 501 F.2d at 1153. Finally, unlike the case at bar where Callahan had actual notice of the sale of as-

de facto merger exception and the third mere continuation exception.

## A. *Mere Continuation*

■ "The seminal case" under Rhode Island law regarding successor liability is *H.J.Baker & Bro., Inc. v. Orgonics, Inc.,* 554 A.2d 196 (R.I.1989). *Casey v. San–Lee Realty, Inc.,* 623 A.2d 16, 18 (R.I. 1993). Under *Baker,* the facts of each particular case must be examined, *H.J.Baker & Bro., Inc. v. Orgonics, Inc.,* 554 A.2d at 205, therefore cautioning against, albeit not barring, summary judgment. The Rhode Island Supreme Court in *Baker* noted the following "five persuasive criteria" in assessing whether a corporation is merely a continuation[32] of its predecessor and therefore responsible for its predecessor's debts:

(1) there is a transfer of corporate assets; (2) there is less than adequate consideration; (3) the new company continues the business of the transferor; (4) both companies have at least one common officer or director who is instrumental in the transfer; and (5) the transfer renders the transferor incapable of paying its creditors because it is dissolved either in fact or by law.

*H.J.Baker & Bro., Inc. v. Orgonics, Inc.,* 554 A.2d at 205.

■ The facts and circumstances of each case must be examined. *H.J.Baker & Bro., Inc. v. Orgonics, Inc.,* 554 A.2d at 205. Furthermore, it is unlikely that the absence of a sufficient showing on one of the *Baker* factors will mandate summary judgment on successor liability under Rhode Island law. First, "[t]he *Baker* court was careful to note that the 'mere continuation' inquiry is multifaceted, and normally requires a cumulative, case-by-case assessment of the evidence by the fact finder." *Ed Peters Jewelry Co. v. C & J Jewelry Co.,* 124 F.3d at 269. Second, if one factor was sufficient it is doubtful that the Rhode Island Supreme Court would have discussed the confluence of factors in both *H.J.Baker & Bro., Inc. v. Orgonics, Inc.,* 554 A.2d at 205 (finding "no competent evidence supports jury's verdict" rejecting successor liability and discussing some but not all *Baker* factors), and in *Casey v. San–Lee Realty, Inc.,* 623 A.2d at 19. Third, the Rhode Island Supreme Court in *Casey* expressly noted its adoption of "the New Jersey rule for determining if a successor entity was in fact a 'continuing entity.'" *Casey v. San–Lee Realty, Inc.,* 623 A.2d at 18. Under the New Jersey rule, "'[n]ot all of [the five *Baker*] factors need be present for a *de facto* merger or continuation to have occurred.'" *Ed Peters Jewelry Co. v. C & J Jewelry Co.,* 124 F.3d at 269. Thus, although the issue is one of first impression, *see Ed Peters Jewelry Co. v. C & J Jewelry Co.,* 124 F.3d at 269 (reversing judgment as a matter of law on absence of successor liability under Rhode Island law, finding that the plaintiff made an adequate showing on each *Baker* factor while assuming *arguendo* that Rhode Island law would require adequate showing on all five fac-

sets to Harrier, there was "no effort to give notice of the change [in ownership]" to the injured third party. *Cyr v. B. Offen & Co., Inc.,* 501 F.2d at 1153. The case is also "no longer good law in light of the New Hampshire Supreme Court's express rejection of its reasoning." *Conway v. White Trucks, A Division of White Motor Corporation,* 885 F.2d 90, 92 n. 2 (3rd Cir.1989). While Callahan emphasizes that Harrier made no effort to distinguish its work at the project site from the former work performed by Dykeman, the fact remains that the receiver notified all of the relevant third parties of the pending sale including the overlap in principals between Harrier and Dykeman.

**32.** *Baker* involved the mere continuation exception in the context of an asset sale.

tors), Rhode Island law would not always require the presence of all of the *Baker* factors in order to find a successor corporation liable as a mere continuation of the seller.

The determinative facts which support Harrier's position that it lacks successor liability are that: Dykeman filed for receivership protection in May 1999 and the Rhode Island Court appointed a receiver; the receiver set an October 1999 deadline for filing claims; Callahan did not file a claim against Dykeman for breach of contract in the Rhode Island court even though the receiver's appointment constituted a default under the subcontract; the receiver notified Callahan about the proposed sale of assets to Harrier; after notice and a hearing, the Rhode Island court approved the sale of assets to Harrier and Netlectric for $790,000 in February 2000; Callahan did not object to the sale or to the sale price; and Dykeman continued in receivership with the receiver performing its business until the Rhode Island court's March 2001 final judgment and dissolution order.

Notwithstanding these undisputable facts, Callahan seeks to impose liability against Harrier under a mere continuation theory of successor liability. Viewing the record in Callahan's favor, as required, it shows that Harrier held itself out as Dykman through correspondence, Harrier performed electrical work, the relevant individuals at the work site viewed Harrier as Dykeman, there was an overlap of officers and stockholders between the two companies and Harrier used the same business address and the same telephone and facsimile numbers as Dykeman. A reasonable jury could readily conclude that there was a transfer of Dykeman's assets, the new company (Harrier) continued the business (electrical work) of the old company (Dykeman) and both companies "have at least one common officer who is instrumental in the transfer." *H.J. Baker & Brothers, Inc. v. Orgonics, Inc.*, 554 A.2d 196, 205 (R.I.1989). Consequently, for purposes of summary judgment, a reasonable jury could find in Callahan's favor relative to the first, third and fourth *Baker* factors.[33]

On the other hand, Harrier paid $790,000 for the assets thereby supporting the presence of adequate consideration. The Rhode Island court, after notice, conducted a judicial hearing before the sale and thereafter issued its approval. Callahan had notice of the asset sale but failed to object. In approving a sale of assets, a court typically considers the sales price, the appreciated value the "amount of advertising, and the nature of the assets." Tobias M. Lederberg *An Overview of Rhode Island Receiverships: Theory and Practice* 45 R.I.B.J. 9, 11 (1997). At the summary judgment hearing, Callahan had no "quarrel[ ] with the judicial sale as a sale." (Docket Entry # 77, p. 35). The sale was therefore commercially reasonable as a matter of law. *See Rhode Island Hospital Trust National Bank v. National Health Foundation*, 119 R.I. 823, 384 A.2d 301, 304 (1978) (citing *Bryant v. American*

---

**33.** The disputed facts also include what entity performed the work at the project site during the time period between Harrier's February 2000 purchase and the stoppage of that work in September or October 2000 prior to Dykeman's March 2001 dissolution. A reasonable jury could view that Harrier performed that work or that Dykeman, operating under receivership, performed that work. Callahan lacks a judicial remedy against Dykeman. Resolving this dispute in Callahan's favor for purposes of the present motion, as required, Harrier performed work at the site even though it lacked an express contract with Callahan and Callahan refused the assignment of the subcontract from Dykeman to Harrier.

*National Bank & Trust Co.,* 407 F.Supp. 360, 364 (N.D.Ill.1976)).

In addition, Callahan never challenged the amount of the sale as inadequate. With Harrier having pointed to the absence of evidence of inadequate consideration, Callahan failed to offer sufficient evidence to convince a finder of fact to rule in its favor by finding that the $790,000 amount was inadequate consideration.

Accordingly, there is no evidence to show that the $790,000 purchase price was less than adequate consideration for Dykeman's assets. Nor is there any direct evidence of actual fraudulent intent. *See generally Ed Peters Jewelry Co. v. C & J Jewelry Co.,* 124 F.3d at 270–272 (inadequate consideration factor met through direct evidence of fraud). To the contrary, Harrier remained ready and willing to assume Dykeman's contractual liabilities under a proposed assignment which Callahan rejected. Unlike the principals of the defendant corporation in *Peters* who "acted with intent to avoid Peters['] claim," *Ed Peters Jewelry Co. v. C & J Jewelry Co.,* 124 F.3d at 268 & 271–272, Harrier affirmatively proposed assuming Dykeman's contractual obligations. In response to such convincing facts, Callahan, at best, points to confusion at the job site relative to which entity was performing the electrical work, Harrier or Dykeman under receivership. The evidence is therefore insufficient for a rational fact finder to find for Callahan relative to the presence of an intent to defraud Callahan and evade Callahan's breach of contract claim against Dykeman.

In addition, after the transfer of assets to Harrier, Dykeman remained in receivership until its dissolution with the proceeds of the sale available to satisfy claims such as Callahan's unasserted breach of contract claim. The order approving the sale expressly transferred any claims against the assets to a claim against the proceeds. Although the October 1999 deadline for filing claims had passed, Callahan could have filed a motion to file an untimely claim. Moreover, prior to the deadline, Callahan had a breach of contract claim based on the June 1999 appointment of a permanent receiver by the Rhode Island court. Finally, Dykeman was not dissolved until more than a year after the sale thereby giving Callahan ample time to file a claim against the assets or proceeds of the sale with the receiver.

The conclusive showing on the second *Baker* factor coupled with the strong showing on the fifth *Baker* factor warrant summary judgment. Taking all of the facts and circumstance together and viewing them in Callahan's favor, including the evidence relative to the other *Baker* factors, Harrier is entitled to summary judgment on the mere continuation theory of successor liability to Callahan.

### B. *De Facto Merger*

■■■■ The Rhode Island Supreme Court has not discussed the de facto merger exception relied on by Callahan. *See Carreiro v. Rhodes Gill and Co., Ltd.,* 68 F.3d 1443, 1448 (1st Cir.1995) ("[w]e are aware of no opinion of the Supreme Court of Rhode Island discussing generally the 'de facto merger' exception").[34] Although the Rhode Island Supreme Court recognizes the mere continuation theory, *H.J. Baker & Brothers, Inc. v. Orgonics, Inc.,* 554 A.2d at 205, the Rhode Island Supreme Court in *Casey* describes *Baker* as "[t]he seminal case in this jurisdiction on successor corporate liability" without distinguishing the mere continuation theory

---

**34.** A search of Rhode Island Supreme Court cases decided after *Carreiro* confirms that the

First Circuit's 1995 statement remains accurate.

from its similar counterpart of de facto merger. *See National Gypsum Co. v. Continental Brands Corp.,* 895 F.Supp. 328, 336 (D.Mass.1995) (while labels of de facto merger and mere continuation "have been enshrined separately in the canonical list of exceptions to the general rule of no successor liability, they appear, in practice[,] to refer to the same concept"). *Baker* focused on the mere continuation theory.[35] *Ed Peters Jewelry Co. v. C & J Jewelry Co.,* 124 F.3d at 271 n. 20.

▪ The failure of the Rhode Island Supreme Court to discuss let alone recognize the de facto merger doctrine necessarily gives this court pause. That said, however, this court will assume *arguendo* that Rhode Island would recognize some theory of successor liability based on the de facto merger test given the weight of authority in other jurisdictions recognizing the doctrine.[36] *See* 15 William Meade Fletcher *Fletcher Cyclopedia Corporations* § 7122 n. 12 (1999) (collecting de facto merger cases).

▪ The factors courts typically consider in determining whether to apply the de facto merger exception are: (1) "a continuation of the enterprise of the seller corporation so that there is continuity of management, personnel, physical location, assets, and general business operations;" (2) "a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation;" (3) "the seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible; and" (4) "the purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation." *Cargill, Inc. v. Beaver Coal & Oil Co., Inc.,* 424 Mass. 356, 676 N.E.2d 815, 818 (1997); 15 William Meade Fletcher *Fletcher Cyclopedia Corporations* § 7124.20 (1999) (same; collecting cases). The first and fourth factors are unquestionably present.

The First Circuit, however, characterizes the second factor as "[o]ne of the key requirements for a merger under traditional corporation law." *Dayton v. Peck, Stow and Wilcox Co.,* 739 F.2d 690, 693 (1st Cir.1984); *Motorsport Engineering, Inc. v. Maserati, S.p.A.,* 183 F.Supp.2d 209, 222 (D.Mass.2001) (quoting *Dayton* ). The *Dayton* decision also criticizes the view espoused by the court in *Turner v. Bituminous Casualty Co.,* 397 Mich. 406, 244 N.W.2d 873, 880 (1976), that the absence of an exchange of stock is not conclusive. *Dayton v. Peck, Stow and Wilcox Co.,* 739 F.2d at 693 n. 3.

▪ For the following reasons, Rhode Island law would likely follow the First Circuit's lead and find this factor a key requirement but would reject the factor as conclusive. First, Rhode Island successor

---

35. In addition to the mere continuation theory, Rhode Island law recognizes actual fraud as a separate successor liability test. *Ed Peters Jewelry Co. v. C & J Jewelry Co.,* 124 F.3d at 271. Indeed, the court in *Baker* discussed the doctrine "of successor liability based on fraud" separate and apart from the doctrine of successor liability based on mere continuation. *H.J. Baker & Brothers, Inc. v. Orgonics, Inc.,* 554 A.2d at 205–206.

36. In the absence of guidance by the state's highest court, "a federal court may consider analogous decisions, considered dicta, scholarly works, and any other data tending to show how the highest court in the state would decide the issue at hand." *Carreiro v. Rhodes Gill and Co., Ltd.,* 68 F.3d at 1448.

liability law emphasizes the factual circumstances of each case. *H.J. Baker & Brothers, Inc. v. Orgonics, Inc.,* 554 A.2d at 205; *Cranston Dressed Meat Co. v. Packers Outlet Co.,* 57 R.I. 345, 190 A. 29, 31 (1937) (whether transaction "amounts to a continuation of an old corporation by means of a new one must be determined ... after a consideration of the facts and circumstances therein"). It is therefore unlikely that the Rhode Island Supreme Court would categorically refuse to apply the de facto merger doctrine in all circumstances where the exchange did not involve stock. In addition, other courts apply the doctrine without requiring a complete transfer of assets in exchange for stock. *Cargill, Inc. v. Beaver Coal & Oil Co., Inc.,* 676 N.E.2d at 819 (shares paid for by sales proceeds);[37] *In Re Acushnet River & New Bedford Harbor Proceedings,* 712 F.Supp. 1010, 1016–1017 (D.Mass.1989) (refusing to limit de facto merger to asset sale made solely with purchaser's own stock and finding parent corporation's stock sufficient).

On the other hand, without a transfer of stock and, instead, a transfer entirely for cash at fair market value with the continued survivorship of the corporation and the availability of the proceeds to satisfy the creditor/plaintiff's contract based claim, the transaction has all the earmarks of a bona fide sale of assets rather than a merger. When a sale of assets "is a bona fide transaction, and the selling corporation receives money to pay its debts, or property that may be subjected to the payment of its debts and liabilities, equal to the fair value of the property conveyed by it, the purchasing corporation will not, in the absence of a contract obligation or actual fraud of some substantial character, be held responsible for the debts or liabilities of the selling corporation." *Pierce v. Riverside Mortgage Securities,* 25 Cal.App.2d 248, 257, 77 P.2d 226 (1938) (citing authorities wherein "[m]any illustrative cases" fully support these propositions); *see Travis v. Harris Corp.,* 565 F.2d 443, 447 (7th Cir.1977) ("[a]bsent a transfer of stock, the nature and consequences of a transaction are not those of a merger"); *see also Armour–Dial v. Alkar Engineering Corp.,* 469 F.Supp. 1198, 1201 (E.D.Wis.1979) ("cases following the general rule make clear that a de facto merger can only be found if the consideration given by the purchaser corporation to the seller corporation for its assets is shares of the purchaser corporation's stock rather than cash"). The widespread acceptance of this principle indicates that Rhode Island law would likely adhere to the First Circuit's view that continuity of shareholders wherein the purchasing corporation exchanges its own stock as consideration for

**37.** Contrary to Callahan's position, *Cargill* does not compel a denial of summary judgment. *Cargill* involved an affirmance of the lower court's summary judgment motion upholding the presence of a de facto merger under Massachusetts law because all of the four factors were satisfied. *Cargill, Inc. v. Beaver Coal & Oil Co., Inc.,* 676 N.E.2d at 818. Unlike the case at bar, the transaction involved a partial transfer of stock. *See Cargill, Inc. v. Beaver Coal & Oil Co., Inc.,* 676 N.E.2d at 819. In addition, the plaintiff was unable to recover the admittedly contractual debt for home heating oil because the seller corporation ceased its business operations and liquidated its assets. *Cargill, Inc. v. Bea-* *ver Coal & Oil Co., Inc.,* 676 N.E.2d at 819. Even though the seller corporation in *Cargill* did not formally dissolve, there is no indication that it remained available after the sale to satisfy the contractual obligation to the plaintiff with the proceeds of the sale. Furthermore, the court in *Cargill* stressed that "[e]ach case must be decided on its *specific* facts and circumstances" and "[o]n *these* facts we conclude that Citizens is the corporate successor to Beaver." *Cargill, Inc. v. Beaver Coal & Oil Co., Inc.,* 676 N.E.2d at 820 (emphasis added). Finally, inasmuch as the case was decided under Massachusetts law, it is not binding to a court applying Rhode Island law.

the seller corporation's assets is a key requirement for applying the de facto merger doctrine.

This assumption is particularly true in the area of contract disputes. As noted by the court in *Cargo Partner AG v. Albatrans, Inc.*, 207 F.Supp.2d 86, 104 (S.D.N.Y.2002), its extensive research "disclose[d] no case (in New York or in other jurisdictions) in which a court has found a de facto merger without at least some degree of ownership continuity" except in the tort areas of product liability where courts justify "new or expanded exceptions on special policy grounds." Recognizing the importance of the continuity of shareholders accomplished by a transfer of stock as consideration for the seller's assets fully supports "the original basis for the de facto merger exception (i.e., the inequity of the seller's shareholders retaining their interest in the transferred assets while cutting off the higher-priority claims of creditors)." *Cargo Partner AG v. Albatrans, Inc.*, 207 F.Supp.2d at 105.

Furthermore, the present case not only lacks the key requirement of a transfer of stock as a matter of law. It also lacks the third criteria. No reasonable finder of fact could conclude that Dykeman did not remain in existence for a period of more than one year after the sale with the proceeds available in receivership to satisfy creditors' claims such as the breach of contract claim now asserted by Callahan. *See, e.g., Gonzalez v. Rock Wool Engineering and Equipment Co., Inc.*, 117 Ill. App.3d 435, 72 Ill.Dec. 917, 453 N.E.2d 792 (1983) (affirming dismissal of amended complaint while noting, in part, that seller corporation "dissolved over a year" after the sale).

Finally, Rhode Island law is more likely to recognize the de facto merger doctrine in product liability cases where claimants lack a remedy and failed to receive notice of the asset sale. Other courts recognize extensions of the doctrine in the product liability area due to the absence of a remedy against the primary corporation.[38] *See National Gypsum Co. v. Continental Brands Corp.*, 895 F.Supp. at 339–340; *accord Cargo Partner AG v. Albatrans, Inc.*, 207 F.Supp.2d 86, 105–109

**38.** In the analogous area of bankruptcy sales, courts likewise do not impose successor liability on the purchaser except in areas involving product liability or a federal statute with an overriding policy. *See generally* 15 William M. Fletcher *Fletcher Cyclopedia of Law of Private Corporations* § 7122 (1991) (number of jurisdictions allow for expanded successor liability in the areas of product liability and under federal statutes). Specifically, these areas include successor liability claims for product liability, *see Wilkerson v. C.O. Porter Machinery Co.*, 237 N.J.Super. 282, 567 A.2d 598, 601–602 (1989) (product line theory whereby purchaser of assets of manufacturer during bankruptcy not insulated from successor liability to the plaintiff injured by bankrupt manufacturer's product), environmental cleanup costs, *see Ninth Ave. Remedial Group v. Allis–Chalmers Corp.*, 195 B.R. 716, 722–723 (N.D.Ind.1996) (bankruptcy court order approving sale free and clear of claims did not relieve purchaser of successor liability for environmental cleanup costs given language and purpose of statute), delinquent pension fund contributions pursuant to the Labor Management Relations Act, *see Anderson v. J.A. Interior Applications, Inc.*, 1998 WL 708851 at *4–7 (N.D.Ill. Sept. 28, 1998), withdrawal liability under ERISA for delinquent pension fund payments, *Chicago Truck Drivers v. Tasemkin, Inc.*, 59 F.3d 48 (7th Cir.1995); *Upholsterers' International Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323 (7th Cir.1990); *Central States Pension Fund v. Hayes*, 789 F.Supp. 1430, 1435–1436 (N.D.Ill.1992), and discrimination claims, *Klegerman v. F.G. Apparel, Inc.*, 1986 WL 2531 (N.D.Ill. Feb. 11, 1986). In contrast, "One who contracts with a debtor prior to reorganization bargains for a legal relationship with the debtor" and "should not be 'entitled to stand aloof' and avoid the consequences of the bankruptcy proceedings." *Schweitzer v. Consolidated Rail Corporation*, 758 F.2d 936, 943 (3rd Cir.1985).

(S.D.N.Y.2002); *see also Cyr v. B. Offen & Co., Inc.,* 501 F.2d at 1153 (tort action where purchase agreement could not "determine the rights of third parties, when no effort to give notice of the change was made"). In the present circumstances, however, Callahan, a contract claimant, had constructive and/or actual notice of the judicial sale and failed to object. Again, no reasonable fact finder could conclude otherwise.

In sum, considering all of the facts and circumstances, including Harrier's continued operation of Dykeman's business, the continuity of management and personnel, the use of the same address and telephone and facsimile numbers, no reasonable finder of fact could find the existence of a de facto merger applying Rhode Island law.

### 4. *Harrier's Alter Ego Liability*

As an initial matter, the question arises of whether to apply Massachusetts or Rhode Island law. At the summary judgment hearing, the parties agreed that Rhode Island law applied to the successor liability issues. (Docket Entry # 77, p. 22). Callahan's theory of piercing the corporate veil or disregarding the corporate entities of Harrier and Dykeman was addressed at another point during the hearing, however, and the parties did not agree or discuss whether Massachusetts or Rhode Island law should apply. It is also apodictic that different laws may apply to the successor liability and the alter ego or corporate veil piercing claims. *See Reisch v. McGuigan,* 745 F.Supp. 56, 59 (D.Mass. 1990) (different laws may "apply to different aspects of a case, depending on which state has the dominant interest in their resolution").

Harrier submits that Rhode Island law applies because of Dykeman and Harrier's incorporation in Rhode Island. Case law in the federal and seventh circuits sup-ports Harrier's position. *See In Re Cambridge Biotech Corp.,* 186 F.3d 1356, 1376 n. 11 (Fed.Cir.1999) (where court disregards corporate entity by piercing corporate veil, "court applies the law of the state of incorporation;" citing *Stromberg Metal Works, Inc. v. Press Mechanical, Inc.,* 77 F.3d 928, 933 (7th Cir.1996)).

■ Where, as here, jurisdiction is based on diversity, a federal court applies the choice of law rules of the state in which it sits, i.e., Massachusetts. *See Klaxon v. Stentor Electric Manufacturing Company,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) (federal court sitting in diversity applies the choice of law rules of the forum state); *American Title Insurance Company v. East West Financial Corporation,* 959 F.2d 345, 348 (1st Cir.1992) (citing *Klaxon* ); *Gates Formed Fibre Products v. Plasti–Vac, Inc.,* 687 F.Supp. 688, 689 (D.Me.1988). The place of incorporation is only one of several factors that Massachusetts courts consider in deciding what law to apply to piercing the corporate veil involving a contractual dispute. *See Evans v. Multicon Construction Corporation,* 30 Mass.App.Ct. 728, 574 N.E.2d 395, 400 (1991) (piercing corporate veil issue and relying on *Restatement (Second) of Conflict of Laws* § 188 (1971), wherein place of incorporation is only one of several factors to determine applicable law).

■ Callahan seeks to pierce the corporate veil of Dykeman or disregard the corporate entities of Dykeman and Harrier and thereby render Harrier liable for Dykeman's breach of contract. Characterizing this claim as a contractual dispute, Massachusetts law applies the law of the place with the most significant relationship to the transaction by assessing the prevalence of the factors set forth in the *Restatement (Second) of Conflict of Laws* § 188 (1971) ("section 188"). *See Evans v. Multicon Construction Corporation,* 574

N.E.2d at 400 (applying section 188 to govern contractual dispute between contractor and subcontractor involving issue of piercing corporate veil). With the exception of the place of incorporation, the factors enumerated in section 188 dictate the application of Massachusetts law. Both the place of contracting and the place of performance are in Massachusetts. The location of the subject matter of the contract is in Massachusetts. The importance of these factors decidedly outweigh the importance of the place of incorporation.

■ Alternatively, the presence of the choice of law clause also dictates the application of Massachusetts law. That clause provides that the subcontract is "governed by the law of the place where the Project is located" (Docket Entry # 52, Ex. C, § 13.1), i.e., Massachusetts. Massachusetts courts typically uphold contractual "choice of law provisions so long as there is no serious conflict with the public policy of Massachusetts and the designated state has some substantial relation to the contract." *Comdisco Disaster Recovery Services, Inc. v. Money Management Systems, Inc.*, 789 F.Supp. 48, 52 (D.Mass. 1992) (citing *Morris v. Watsco, Inc.*, 385 Mass. 672, 433 N.E.2d 886, 888 (1982), and *Steranko v. Inforex, Inc.*, 5 Mass.App.Ct. 253, 362 N.E.2d 222, 228 (Mass.1977)).

Accordingly, Massachusetts law applies to Callahan's corporate disregard or veil piercing theory of liability. At the outset, Harrier's lack of ownership in Dykeman is not dispositive to applying the corporate disregard or alter ego theory and thereby holding Harrier liable for Dykeman's breach of contract. Indeed, in the seminal case, *My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614, 233 N.E.2d 748 (1968), liability was imposed even though "the satellite corporations were not the subsidiaries of Cumberland Farms" inasmuch as a single individual, Byron Ha-

seotes, was the dominant figure in both companies. *Commonwealth v. Beneficial Finance Co.*, 360 Mass. 188, 275 N.E.2d 33, 91 (1971). Similarly, Christopher and Thomas Dykeman, although not named as defendants, purportedly exercise the type of pervasive control over both corporations such that the corporations, given their shared management, purpose, address, telephone and facsimile numbers, should be viewed as a single entity.

At first glance, the corporations appear similar. Christopher and Thomas Dykeman conducted the day to day business of both companies and held the same titles in both companies. Although Christopher Dykeman did not own shares in Harrier, his spouse owned 49% of the shares and, viewing the record in Callahan's favor, used funds from a joint bank account to purchase these shares. The companies used similar names and had the same address. They also had the same telephone and facsimile numbers.. Upon closer inspection, however, summary judgment is warranted.

■ "Under Massachusetts law, disregarding separate corporate entities is the exception, not the rule." *Hiller Cranberry Products, Inc. v. Koplovsky Foods, Inc.*, 165 F.3d 1, 10 (1st Cir.1999). Stated otherwise, in Massachusetts, corporate veils are pierced only "in rare situations." *Birbara v. Locke*, 99 F.3d 1233, 1238 (1st Cir.1996) (collecting Massachusetts cases); accord *Evans v. Multicon Construction Corp.*, 574 N.E.2d at 398 (piercing permissible "in 'rare particular situations to prevent gross inequity'"). The decision of *My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614, 233 N.E.2d 748 (1968), sets forth the general standard applicable in tort cases. *Birbara v. Locke*, 99 F.3d at 1238 (characterizing *My Bread*

as "the seminal ruling on veil piercing in a tort case").[39]

As expressed by the SJC in *My Bread*, the common ownership of stock together with common management,[40] standing alone, does not give "rise to liability on the part of one corporation for the acts of another corporation." *My Bread Baking Co. v. Cumberland Farms, Inc.*, 233 N.E.2d at 751–752. Ownership of all the stock in a number of corporations " 'by one person does not create a single unit to justify a disregard of separate corporations.' " *Gordon Chemical Co. v. The Aetna Casualty and Surety Co.*, 358 Mass. 632, 266 N.E.2d 653, 657 (1971). Rather, "additional facts" are required to impose such liability. *My Bread Baking Co. v. Cumberland Farms, Inc.*, 233 N.E.2d at 752.

The SJC in *My Bread* summarized the general principles applicable to assessing whether to disregard the entities of two, separately formed corporations. Disregarding two corporate entities with common stock and management is particularly apt:

> (a) when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the intercorporate relationship, or (b) when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting.

*My Bread Baking Co. v. Cumberland Farms, Inc.*, 233 N.E.2d at 752; *accord Birbara v. Locke*, 99 F.3d at 1238 (same).

With respect to the first prong, there was no "pervasive control" by Harrier of Dykeman at the relevant time. Callahan argues that it was confused about which entity was performing the contract after the sale of assets to Harrier. By this time, however, Dykeman was under the sole and exclusive control of the receiver. It is true that the receiver delegated the authority to run the business to Christopher and Thomas Dykeman after Dykeman filed for receivership. The receiver, however, remained in control of the business and its property at all times. R.I. Gen. Laws § 7–1.1–91. Thus, although Christopher and Thomas Dykeman controlled the activities of Harrier, they did not control the activities of Dykeman in receivership. Their power and authority over Dykeman emanated solely from the receiver. The court order, a matter of public record, endowed the receiver with the express power to conduct Dykeman's business and disburse funds. When Harrier and Netlectric purchased the assets of Dykeman for $790,000, Dykeman remained

---

**39.** The First Circuit in *Birbara* raised the possibility of applying a stricter standard of piercing in contract cases but noted that Massachusetts law has not created such a distinction. *Birbara v. Locke*, 99 F.3d at 1238. In fact, shortly after the *My Bread* decision, the Massachusetts Supreme Judicial Court ("SJC") considered a contract case without making a distinction between tort and contract alter ego liability. *See Gordon Chemical Co. v. The Aetna Casualty and Surety Co.*, 358 Mass. 632, 266 N.E.2d 653, 657 (1971). Because the present facts warrant summary judgment, this court need not address whether a stricter standard applies in a contract case.

**40.** Furthermore, in the case at bar, the "common management" took place at different times. By the time of Harrier's incorporation, Dykeman was in receivership being managed by the receiver.

in receivership and therefore under the exclusive control of the court and the court's appointed receiver. *See* R.I. Gen. Laws § 7–1.1–91(f) ("The court appointing the receiver has exclusive jurisdiction of the corporation and its property"). Any apparent control by Harrier or Christopher and Thomas Dykeman over Dykeman in receivership was a fiction. No rational finder of fact could conclude that Christopher and Thomas Dykeman remained in control of Dykeman's operations after the company filed for receivership.

With respect to the second prong, there was no confused intermingling of activity of Harrier and Dykeman. There was no showing that half of the subcontract was being performed by Harrier while the other half was being performed by Dykeman in receivership in the spring or summer of 2000. Callahan knew of the sale of Dykeman assets to Harrier and the overlap in principals. Harrier maintained an identity separate from Dykeman's operations in receivership. As part of the asset transaction, Harrier purchased the right to use the Dykeman name and filed the proper corporate papers designating Dykeman Electrical Contractors as the company's fictitious name. *Cf. Birbara v. Locke,* 99 F.3d at 1239 (reversing jury verdict and finding the plaintiffs not entitled to recover under second prong inasmuch as the defendants maintained formal distinctions between the corporations, had distinct boards of directors with separate board meetings and kept individual financial records). Like the corporations at issue in *Birbara,* there "is no evidence showing that [Dykeman in receivership] was a sham or merely a shield behind which [Harrier] could hide to escape liability for its own obligations." *Birbara v. Locke,* 99 F.3d at 1239.

█ The first and second prongs of *My Bread* do not establish a genuine issue of material fact. Examining the underlying factors that elucidate the issue of whether to set aside the corporate form likewise confirms that Harrier, created in December 1999, and Dykeman, in receivership since May 1999, retained separate corporate identities as a matter of law:

> The relevant factors are (1) common ownership; (2) pervasive control; (3) confused intermingling of business assets; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporation's funds by dominant shareholder; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud.

*Attorney General v. M.C.K., Inc.,* 432 Mass. 546, 736 N.E.2d 373, 381 n. 19 (2000); *accord Evans v. Multicon Construction Corp.,* 574 N.E.2d at 398 (setting forth these 12 factors and citing *Pepsi–Cola Metropolitan Bottling Co. v. Checkers, Inc.,* 754 F.2d 10, 14–16 (1st Cir.1985)).

As previously discussed, although there was a degree of common ownership between both corporations, Harrier or Thomas and Christopher Dykeman never had the necessary pervasive control over the activities of Dykeman. That authority and control remained with the court and the court appointed receiver. R.I. Gen. Laws § 7–1.1–91. By express court order, the receiver had the power to conduct Dykeman's business. Even if the receiver delegated that authority to Christopher and Thomas Dykeman who then continued to perform the subcontract in 1999 after filing for receivership, it is unreasonable to conclude that operationally they controlled Dykeman's property or that financially they controlled the disbursement of funds.

The control of Harrier and the control of Dykeman differed significantly. One was under the control of the court and being operated by a receiver whereas the other was being operated by its owners and corporate officers. *Cf. George Hyman Construction Co. v. Gateman*, 16 F.Supp.2d 129, 151 (D.Mass.1998) (group of individuals commonly owned and controlled the two corporations). Thus, while the first factor weighs in favor of Callahan, the second factor decidedly weighs in favor of Harrier.

The third factor slightly favors Callahan. Harrier used the same telephone and facsimile as well as the same address as Dykeman. Callahan also paid Dykeman a number of times as opposed to Harrier or the receiver. Individuals at the job site believed they were dealing with Dykeman. Records were perhaps stored at the same location. *See George Hyman Construction Co. v. Gateman*, 16 F.Supp.2d at 151 (common letterhead, use of same storage site and vendor confusion as to entity supported existence of confused intermingling). On the other hand, the receiver retained control of Dykeman's funds and had the ultimate authority over their disbursement prior to dissolution. Dykeman's assets and property also remained in the hands of the receiver.

Additional factors do not favor Callahan. Although Dykeman's capital was stretched, there is no indication that the receiver did not supply or approve the cash disbursements necessary for Dykeman to continue to perform the subcontract in 1999. *See, e.g., Evans v. Multicon Construction Corporation*, 574 N.E.2d at 398 ("[d]uring its active corporate life, MCC did not want for assets"). Harrier observed corporate formalities, the receiver notified all parties, including Callahan, about the sale of assets to Harrier and the commonality of principals between the two companies. Harrier

filed a fictitious name statement with the Secretary of the State of Rhode Island. Cash flow disbursements were filed with the receiver. The sale of assets from Dykeman to Harrier took place under judicial supervision.

During the period of Harrier's involvement at the site, there is no indication that Harrier paid Thomas and Christopher Dykeman unreasonably excessive salaries or bonuses. *See Evans v. Multicon Construction Corporation*, 574 N.E.2d at 399. Moreover, "a business can have a legitimate purpose even if it is not designed to make dividends or profit distributions." *George Hyman Construction Co. v. Gateman*, 16 F.Supp.2d at 154. The absence of evidence relative to whether Harrier paid dividends therefore does not favor Callahan.

■ As to the eighth factor, insolvency is the inability to pay debts as they become due, *see Birbara v. Locke*, 99 F.3d at 1241 ("TFG was insolvent, unable to pay its debts as they fell due"), and is evaluated "at the time of the litigated transaction." *Attorney General v. M.C.K., Inc.*, 736 N.E.2d at 381 n. 19. The litigated transactions took place, by definition, after Harrier's creation in December 1999. Dykeman became insolvent before Harrier purchased its assets. *See Birbara v. Locke*, 99 F.3d at 1241 ("TFG became insolvent before CRI assumed ownership" and "[t]hat TFG may have continued to be under capitalized in these circumstances does not argue for piercing the corporate veil").

Addressing the remaining factors, there is no evidence of the syphoning of Dykeman's assets during receivership. Like the circumstances in *Birbara*, this is not "a case of 'financial misconduct of the subsidiary involving such manipulation as asset-stripping or asset-siphoning, which depletes the resources of the subsidiary.'"

*Birbara v. Locke,* 99 F.3d at 1241 (reversing jury verdict and finding evidence insufficient to pierce corporate veil of a new parent corporation that purchased and tried to salvage insolvent business). The nonfunctioning of Dykeman's officers existed, if at all, because of the prior receivership filing. There is no indication that Thomas or Christopher Dykeman used Dykeman for their personal transactions. *Cf. Pepsi–Cola Metropolitan Bottling Co., Inc. v. Checkers, Inc.,* 754 F.2d at 16 (dominant shareholder used corporations "for his own personal transactions" and paid other primary shareholder's "personal obligations"). There is also no basis to conclude that Dykeman, operating in receivership during the relevant time, was used to perpetrate a fraud. *See Evans v. Multicon Construction Corporation,* 574 N.E.2d at 399–400 (financial condition of MCC "ascertainable from the certificates of condition on file, documents which did not hide that invested capital was thin").

Finally and tellingly, this court's research uncovered no case wherein a plaintiff was attempting to use the corporate veil piercing or disregard theory to pierce the corporate veil of a corporation for conduct occurring during its state receivership. In sum, no reasonable jury could find in Callahan's favor and disregard Dykeman, operating under the control of a receiver, as an entity distinct and separate from Harrier.

## II. *MOTION OF JOHN T. CALLAHAN & SONS, INC. FOR PARTIAL SUMMARY JUDGMENT (DOCKET ENTRY # 50); MOTION FOR SUMMARY JUDGMENT IN FAVOR OF DEFENDANT EMPLOYERS INSURANCE OF WASSAU A MUTUAL COMPANY (DOCKET ENTRY # 44)*

▪ Wassau moves for summary judgment on the basis that Callahan made a

conscious decision not to declare Dykeman in default at the time of the receivership filing in May 1999 even though, as Wassau correctly points out, the general terms and conditions of the contract defined a default as, *inter alia,* the appointment of a receiver on account of a subcontractor's insolvency. According to Wassau, Callahan's decision materially prejudiced Wassau because by the time Callahan declared a default in October 2000, the individual indemnitors had pledged all of their assets by purchasing Dykeman's assets for $790,000 in February 2000. Wassau argues that the depletion of the indemnitors' assets and the resulting dramatic increase in Wassau's risk under the performance bond amounts to a discharge of Wassau's liability as a surety. In short, Wassau submits that its liability on the performance bond was materially altered by Callahan's failure to act and declare a default in a more timely manner.

▪ Wassau additionally argues that Callahan knowingly waived its right to make a claim under the performance bond by not declaring a default based on the receivership filing in May 1999. Wassau reasons that Callahan's decision not to declare a default until October 2000 and its acceptance of the work performed by Dykeman and Harrier constitutes a waiver of its right to seek recovery under the performance bond.

▪ Addressing these two arguments *seriatim,* this court agrees with the principles set forth in the cases relied upon by Wassau. These principles provide that a material change in the underlying contract made without a surety's consent operates as a discharge if the modification materially increases the surety's risk.[41]

---

41. Under Massachusetts law, applicable to       the present claim, "a compensated surety is

*See National Surety Corporation v. United States*, 118 F.3d 1542, 1544 (Fed.Cir. 1997) ("surety bond embodies the principle that any material change in the bonded contract, that increases the surety's risk or obligation without the surety's consent, affects the surety relationship" and, other than an extension of time for payment, discharges surety if modification materially increases surety's risk); *Leila Hospital and Health Center v. Xonics Medical Systems, Inc.*, 948 F.2d 271, 275 (6th Cir.1991) ("surety law suggests that a substitution of obligors releases the surety because it creates 'a different contract on which they never intended to become liable'"); *United States v. Reliance Insurance Co.*, 799 F.2d 1382, 1385 (9th Cir.1986) ("as a general rule a surety will be discharged where the bonded contract is materially altered or changed without the surety's knowledge or consent"); *Reliance Insurance Co. of Philadelphia v. Colbert*, 365 F.2d 530, 534 (D.C.Cir.1966) (when surety "commit[s] itself with respect to one contract, amendments which convert that agreement into a significantly different one should be brought to the attention of the surety so

that it may exercise its own business judgment as to whether it wishes to continue its commitment"); *Carriage Town, Inc. v. LandCo, Inc.*, 998 F.Supp. 646, 648 (D.S.C. 1998) (noting, in context of an amendment to the underlying agreement shortening cure period, that "an alteration of the underlying risk assumed by the surety will discharge the surety from its obligations under the bond where the surety does not receive notice or consent to the additional risk"); *Employers Insurance of Wausau v. Construction Management Engineers of Florida, Inc.*, 297 S.C. 354, 377 S.E.2d 119, 121 (1989) (summary judgment for surety inasmuch as execution of second contract which changed nature of work performed by obligor substantially modified original bonded contract and thereby discharged surety);[42] *see also Prairie State National Bank of Chicago v. United States*, 164 U.S. 227, 239, 32 Ct.Cl. 614, 17 S.Ct. 142, 41 L.Ed. 412 (1896) (change by principal parties to underlying contract without surety's consent causes discharge of surety).

With the exception of *Leila* and *Prairie State*, discussed *infra*, all of the foregoing

---

'discharged if the modification materially increases [the surety's] risk.'" *Town of Hingham v. B.J. Pentabone, Inc.*, 354 Mass. 537, 238 N.E.2d 534 (1968) (surety's liability under performance bond).

**42.** *Employers* also stands for the principal that where, as here, the bond incorporates the underlying contract, the two contracts "are construed together as a whole to ascertain the intent of the parties." *Employers Insurance of Wausau v. Construction Management Engineers of Florida, Inc.*, 377 S.E.2d at 121. The performance bond provided that the "subcontract is by reference made a part hereof." (Docket Entry # 52, Ex. D). Additionally, courts interpret "indemnity agreement[s] in accordance with the rules governing the construction of contracts generally." *Andre Construction Association, Inc. v. Catel, Inc.*, 293 N.J.Super. 452, 681 A.2d 121, 123 (1996); *accord Carriage Town, Inc. v. LandCo, Inc.*, 998 F.Supp. at 648 ("if language used by a

bond is plain and unambiguous the bond should be interpreted like any other contract to determine the intent of the parties"). These principles accord with Massachusetts law. *Callahan v. A.J. Welch Equipment Corporation*, 36 Mass.App.Ct. 608, 634 N.E.2d 134, 137 (1994) (indemnity contracts interpreted "like any contract with attention to language, background and purpose"); *see Cody v. Connecticut General Life Insurance Company*, 387 Mass. 142, 439 N.E.2d 234, 237 (1982) (insurance contracts, like other contracts, are "construed 'according to the fair and reasonable meaning of the words in which the agreement of the parties is expressed'"); *see also High Voltage Engineering Corporation v. Federal Insurance Company*, 981 F.2d 596, 600 (1st Cir.1992) (where language is plain and definitely expressed, insurance contract is enforced "in accordance with its terms").

cases cited by Wassau are distinguishable from the case at bar because Wassau is not arguing that the parties made a material and prejudicial change to the subcontract. Rather, Wassau is arguing that Callahan's delay in declaring a default materially prejudiced Wassau or materially increased its risk under the bond because, during the interim, the individual indemnitors encumbered their assets by purchasing Dykeman's assets in February 2000.

Callahan's delay in declaring a default, if any, was not a breach of the underlying contract or a material modification thereof. Under the terms of the performance bond, the parties did not set a time period for Callahan to declare a default.[43] The plain language of the performance bond triggers the surety's obligations, "Whenever Principal [Dykeman] shall be, and declared by Obligee [Callahan] to be in default under the subcontract, the Obligee having performed Obligee's obligations thereunder." (Docket Entry # 52, Ex. D). A "default under the subcontract" occurs, *inter alia*, "if a receiver is appointed on account of the Contractor's insolvency." (Docket Entry # 52, Ex. C). Under these provisions, a default occurred if: (1) a receiver was appointed for Dykeman due to insolvency; *and* (2) Callahan made a declaration of default. Callahan's decision not to declare a default in May 1999 or February 2000 was permissible under the terms of the performance bond. Accordingly, its delay in declaring a default did not materially modify the subcontract.

■ Under *Leila*, the substitution of Harrier for Dykeman in receivership might discharge Wassau because it created a modification or " 'a different [underlying] contract,' " *Leila Hospital and Health Center v. Xonics Medical Systems, Inc.*, 948 F.2d at 275; *Prairie State National Bank of Chicago v. United States*, 164 U.S. at 239, 17 S.Ct. 142, provided that Wassau, a compensated surety, establishes that the modification materially increased Wassau's risk. *See Town of Hingham v. B.J. Pentabone, Inc.*, 354 Mass. 537, 238 N.E.2d 534, 536 (1968); *see also Bayer & Mingolla Construction Co.v. Deschenes*, 348 Mass. 594, 205 N.E.2d 208, 211 (1965); *Maryland Casualty Co. v. Dunlap*, 68 F.2d 289, 291 (1st Cir.1933); *Leila Hospital and Health Center v. Xonics Medical Systems, Inc.*, 948 F.2d at 275 (surety must also demonstrate " 'material departure from the contract which resulted in some injury to the surety' "); *Restatement (Third) of Suretyship and Guaranty* §§ 37(2) & 39(c) (1996) (surety discharged if obligee fundamentally alters surety's risk by releasing principal obligor without preserving recourse against surety or circumstances show obligee's similar intent). Any such substitution, however, is a genuine issue of material fact. As previously indicated, whether Dykeman, operating under receivership, performed the contract after February 2000 is disputed.[44]

Although not cited by the parties, Massachusetts courts are likely to adhere to

---

**43.** The parties did agree that, "Any suit under this bond must be instituted before the expiration of two (2) years from the date the Principal ceased work on said subcontract." (Docket Entry # 52, Ex. D). Wassau's argument might merit summary judgment if Callahan's delay resulted in the running of a statute of limitations or a violation of this express condition. *See Restatement (Third) of Suretyship and Guaranty* §§ 43 & 50(1)(c) (1996). Callahan's March 2001 timely filing of this action precludes any reliance on this provision.

**44.** The inability of Wassau to raise untimely notice does not impact its ability to argue that Harrier's substitution, if any, modified the underlying contract and materially increased its risk. In other words, allowing Callahan's summary judgment motion does not preclude Wassau from raising this defense.

the principles set forth in the *Restatement (Third) of Suretyship and Guaranty* § 50 (1996). *See, e.g., Putignano v. Treasurer and Receiver General,* 55 Mass.App.Ct. 828, 774 N.E.2d 1157, 1161 (2002) (citing *Restatement (Third) of Suretyship and Guaranty* § 67(1) (1996)); *Scafidi v. Lumbermens Mutual Casualty Co.,* 1997 WL 177822 at * 2 (Mass.Super. April 7, 1997) (citing *Restatement (Third) of Suretyship and Guaranty* § 42 (1995)). This is particularly true where, as here, no Massachusetts case is directly on point.

Section 50 prescribes the rule applicable to a surety's obligations resulting from a delay on the part of the obligee to take action against the principal obligor:

§ 50. Effect On Secondary Obligation Of Obligee's Lack Of Action To Enforce Underlying Obligation

(1) Delay by the obligee in taking action against the principal obligor with respect to the underlying obligation, or failure of the obligee to take such action, does not discharge the secondary obligor with respect to the secondary obligation except as provided:

(a) by applicable statute;

(b) by agreement of the parties;

(c) in § 43 of this Restatement; or

(d) in subsection (2) of this section.

*Restatement (Third) of Suretyship and Guaranty* § 50 (1996). Callahan's delay in proceeding against Dykeman and in declaring a default does not fall within the above exceptions. An illustration in the comment shows that the rule applies even though during the period of delay the principal obligor becomes insolvent:

2. P owes C $1,000 with S as secondary obligor. P defaults and C conducts a series of negotiations with P in respect of payment without modifying the contract between C and P. The negotiations are fruitless. Although P was solvent at the time of default, P becomes wholly insolvent during the period of the delay. S is not discharged from its secondary obligation by reason of the delay.

*Restatement (Third) of Suretyship and Guaranty* § 50, cmt. a (1996).

Accordingly, Callahan's delay in declaring a default, even if it prejudiced Wassau's ability to obtain reimbursement from the principal obligors under the general indemnity agreement, does not discharge Wassau from its obligations under the performance bond. In addition, Callahan is not seeking recompense from Wassau based on the default due to the receivership filing and concomitant appointment of a receiver. Rather, Callahan submits that Dykeman's failure to complete the work and its termination of the contract constitutes the relevant default under the subcontract. (Docket Entry # 64, Ex. W). This occurred at the earliest in February 2000. In sum, Wassau is not entitled to summary judgment due to Callahan's decision to delay declaring Dykeman in default.

As a final issue, Wassau submits that Callahan's inaction and conscious decision not to declare a default in May 1999 or in February 2000 amounted to a waiver of its rights under the performance bond to proceed against Wassau. Waiver, the intentional relinquishment of a known right, is ordinarily a question of fact. *Graustein v. Wyman,* 250 Mass. 290, 145 N.E. 450, 452 (1924). Callahan's conduct falls short of a relinquishment of its right to proceed against Wassau under the performance bond. The case relied upon by Wassau, *The Providence Washington Insurance Co. v. Beck,* 356 Mass. 739, 255 N.E.2d 600, 601 (1970), is distinguishable on its facts. In *Providence,* the contractor's repeated acceptance of late payments constituted a waiver of the contractor's breaches of not complying with the pay-

ment schedule. Nor, viewing the record in Callahan's favor, does Callahan's decision to proceed with an unbonded contractor such as Harrier constitute a waiver of its right to collect from Wassau under the performance bond. As discussed *supra*, Callahan acted within the parameters of the terms of the performance bond. As long as Callahan took action within two years of the cessation of work, the bond did not expressly require Callahan to act within a shorter period of time. Summary judgment for Wassau on grounds of waiver is improper.

Callahan moves for summary judgment solely on the issue of whether Wassau may rely on the defense of untimely notice of a bond claim to disclaim its liability under the performance bond. In light of the foregoing, Callahan is entitled to summary judgment.

### CONCLUSION

For reasons stated above, Harrier's motion for summary judgment (Docket Entry # 55) is **ALLOWED**. Callahan's motion for summary judgment (Docket Entry # 50) is also **ALLOWED** to the extent that Wassau may not rely on the defense of untimely notice of the default as a basis to disclaim liability under the performance bond. The fifteenth and seventeenth defenses in Wassau's answers are stricken. Wassau's summary judgment motion (Docket Entry # 44) is **DENIED**.